# EXHIBIT 8

1

1    UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
2         CIVIL ACTION NO. 3:22-cv-04585

3

4    GPI, LLC,

5              Plaintiff,              REMOTE DEPOSITION
                                              OF:
6              v.
                                       DIANE MARCKS
7    RAPSYS INCORPORATED
     d/b/a GEESE POLICE OF
8    NAPERVILLE; and
     VIDMANTAS RAPYSYS,
9
               Defendants.
10

11

12

13        **T R A N S C R I P T** of remote deposition

14   stenographically reported by and before MICHELE

15   QUICK, a Certified Court Reporter, Registered Merit

16   Reporter and Certified Realtime Reporter of the

17   State of New Jersey, authorized to administer oaths

18   remotely pursuant to R.S. 41:2-1 and A-3864, via

19   Zoom videoconference, on Wednesday, May 24, 2023,

20   commencing at 9:55 a.m.

21

22              **QUICK COURT REPORTING, LLC**
                     **47 BRIAN ROAD**
23         **WEST CALDWELL, NEW JERSEY 07006**
                    **(973) 618-0872**
24           **office@quickreporters.com**

25

2

1   A P P E A R A N C E S:

2

3          BUCHANAN, INGERSOLL & ROONEY, P.C.
          Union Trust Building
          501 Grant Street, Suite 200
4         Pittsburgh, Pennsylvania 15219
          BY:  GRETCHEN JANKOWSKI, ESQ.
5              gretchen.jankowski@bipc.com
          Counsel for the Plaintiff
6

7          GreenspoonMarder, LLP
          One Riverfront Plaza
8         1037 Raymond Boulevard, Suite 900
          Newark, New Jersey 07102
9         BY:  EVAN M. GOLDMAN, ESQ.
               evan.goldman@gmlaw.com
10        Counsel for the Defendants

11

    ALSO PRESENT:  Vidmantas Rapsys (no video)
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                         I N D E X

2

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS
3
DIANE MARCKS
4
   By: Mr. Goldman      4
5

6

7
             EXHIBITS MARKED FOR IDENTIFICATION
8

9   NUMBER    DESCRIPTION                        PAGE

10  D-3        Verified Complaint                  32

11  D-6        Letter from Diane Marcks to Patty
               Deering                             40
12

13

14        (Exhibits were marked and retained by Mr.

15  Goldman.)

16

17

18

19

20

21

22

23

24

25

4

1   D I A N E   M A R I E   M A R C K S, 2597 Southeast

2   12th Street, Pompano Beach Florida 33062, first

3   having been duly sworn, testified as follows:

4   DIRECT EXAMINATION BY MR. GOLDMAN:

5       Q.      Good morning, Ms. Marcks.  My name is

6   Evan Goldman, I'm a partner at the law firm of

7   Greenspoon Marder, LLP.  I represent the defendants

8   in this matter, <u>GPI, LLC vs. Rapsys, Incorporated,</u>

9   which matter is pending in the United States

10  District Court for the District of New Jersey.  I

11  will refer to that as "the litigation" or "the

12  lawsuit"; is that okay?

13      A.      Yes.

14      Q.      Thank you.  Just while we're on the

15  record, could you please state your full name for

16  the record?

17      A.      Diane Marie Marcks.

18      Q.      Thank you.  Are you familiar with the

19  litigation --

20              MS. JANKOWSKI:  Before you get

21  started, Evan, I just want to make sure that we have

22  on the record that all objections except as to form

23  are reserved until trial.  Correct?

24              MR. GOLDMAN:  Understood.

25              MS. JANKOWSKI:  Okay.  Go ahead.

5

1          Q.      Sorry, Ms. Marcks, are you familiar

2    with the litigation I mentioned earlier?

3          A.      Yes.

4          Q.      And are you familiar with the

5    underlying relationship between GPI, LLC and Vid

6    Rapsys and his entity?

7          A.      Yes.

8          Q.      Okay.  What is your role with GPI, LLC,

9    if any?

10         A.      I am -- I was the operating member or

11   president.

12         Q.      Operating member and president, you

13   said?

14         A.      And what?

15         Q.      President?  Did I hear you correct?

16         A.      Yes.

17         Q.      All right, and I'll get back to that in

18   a minute.  Have you ever been deposed before?

19         A.      Yes.

20         Q.      How many times have you been deposed?

21         A.      Once.

22         Q.      Okay.  How long ago is that?

23         A.      About 34 years ago.

24         Q.      So it's been some time since you've

25   been deposed, fair to say?

6

1      A.     Correct.

2      Q.     All right.  So I'm going to go through

3  just some ground rules, and just for the record,

4  before I do, Mr. Pilsner just joined remotely.  I'm

5  going to go through some ground rules just to

6  hopefully make this go smoothly and efficiently.

7          Do you understand you are under oath

8  and your testimony may be used at trial in this or

9  other matters?

10      A.     Yes.

11      Q.     Particularly because we're on Zoom,

12  it's important that you understand my questions and

13  we allow each other to finish.  To that extent, you

14  know, the court reporter cannot understand nods of

15  the head or other nonaudible gestures, so I would

16  just ask that you speak loudly and clearly and

17  audibly, if that's okay.

18          If you under -- I'm sorry, if you

19  answer my question, I will presume you understood

20  it.  If you do not understand my question, please

21  let me know and I'm happy to rephrase it.  Does that

22  work?

23      A.     Yes.

24      Q.     Most importantly, if your attorney

25  objects, please let her make her objection before

1  answering, and as a general rule, I'd rather you not

2  guess.  To the extent you're making an estimate or

3  something, please let us know in advance that you

4  are making an estimate but don't just guess, and I'm

5  sure your counsel would appreciate that instruction.

6         If you need a break, you know, just

7  ask.  This isn't a torture chamber, you know, if

8  there's a pending question, I'll ask that you answer

9  it, but otherwise, take as many breaks that you need

10  throughout the day.  Is that okay with you?

11      A.     Thank you.

12      Q.     Is there any reason you cannot testify

13  truthfully today?

14      A.     No.

15      Q.     Okay.  In preparation for today's

16  deposition, did you review any documents?

17      A.     I didn't hear you, I'm sorry.

18      Q.     Okay.

19      (Background noise)

20      Q.     I don't know who just spoke, I'm sorry.

21      A.     I said I didn't hear you.

22      Q.     Okay, thank you.

23             In preparation for today's deposition,

24  did you review any documents?

25      A.     Yes.

8

1          Q.      What documents did you review?

2          A.      The testimony of Jeremy and Vid.

3          Q.      Okay.  I understand -- not I

4     understand, I know Mr. Rapsys was deposed twice.

5     Did you review both of his deposition transcripts or

6     just one?

7          A.      Yes, both.

8          Q.      Any other documents besides the

9     deposition transcripts?

10         A.      No.

11         Q.      In preparation for today's deposition,

12    did you speak to anyone?

13         A.      No.  My attorney.

14         Q.      Besides your attorney, did you speak to

15    any current or former member or employee or officer

16    of GPI, LLC or Geese Police, Inc.?

17         A.      Just my office manager, Jeremy Brown.

18         Q.      And you spoke to your attorneys; is

19    that correct?

20         A.      Correct.

21         Q.      I'm not going to ask you anything about

22    your conversations with your attorneys, but what did

23    you speak to Mr. Brown about?

24         A.      About what was happening with the

25    business of the day.

9

1          Q.      Sorry, when you say "the business of

2     the day," do you mean the ongoing business

3     operations of Geese Police, Inc. or GPI, LLC, or do

4     you mean in the litigation?

5                  MS. JANKOWSKI:  Objection to form.

6     You may answer.

7          A.      No, the daily business of Geese Police

8     in New Jersey.

9          Q.      Okay.  Thank you.

10                 Can you approximate how many hours or

11    minutes you spent preparing for today's deposition,

12    both in speaking to Mr. Brown and to your counsel?

13         A.      Maybe five and a half, six hours.

14         Q.      Thank you.

15         A.      You're welcome.

16         Q.      You said earlier that you were the

17    operating partner and president of GPI, LLC; is that

18    correct?

19         A.      Yes.

20         Q.      Okay.  Do you have any role with GPI,

21    LLC as of today?

22         A.      No.

23         Q.      Okay.  When you -- strike that.

24                 When were you last formally involved

25    with GPI, LLC?

10

1      A.      December 31 of '22.

2      Q.      And what happened on 1/1/23 [sic] that

3   changed your involvement?

4      A.      GPI, LLC was gifted to my late

5   husband's nephew, Craig Neveras.

6      Q.      And when you say "gifted," do you mean

7   gifted with no remuneration paid back to you?

8      A.      Correct.

9      Q.      And at the time you gifted GPI, LLC to

10   Mr. Neveras, were you the only LLC member of the

11   entity?

12      A.      Yes.

13      Q.      And let me start by saying my

14   condolences; I understand your husband passed away

15   about 18 months ago, so my condolences for that.

16      A.      Thank you.

17      Q.      Was he -- before his passing, was he a

18   member of GPI, LLC?

19      A.      Yes.

20      Q.      Okay.  And at the time of his passing,

21   were you and he the only members of GPI, LLC?

22      A.      After his passing?

23      Q.      At the time of his passing.

24      A.      No.

25      Q.      Who else was a member of GPI, LLC while

11

1    --

2          A.      David Marcks and Diane Marcks.

3          Q.      Okay, so it was just the two of you

4    until he passed and then it became just you,

5    correct?

6          A.      Correct.

7          Q.      Okay.  When did you become a member of

8    GPI, LLC?

9          A.      After we were married in 2012.

10         Q.      And prior to you becoming a member in

11   2012, was Mr. Marcks the only member of GPI, LLC?

12         A.      Yes.

13         Q.      And do you understand, is that true

14   from the beginning of GPI, LLC until 2012?

15         A.      I have no knowledge of that.

16         Q.      Okay.  Are you aware of anyone else

17   that was ever a member of GPI, LLC besides you, Mr.

18   Marcks and now Mr. Neveras?

19         A.      Diane Neveras possibly may, I'm not

20   sure.

21         Q.      Okay.  Would that have been prior to

22   2012 when you and Mr. Marcks married?

23         A.      Yes.

24         Q.      Understood.  Thank you.

25                 Are you currently employed by any

12

1   entity or person?

2          A.      No.

3          Q.      Do you have any role in Geese Police,

4   Inc.?

5          A.      Yes, I am the operating president of

6   Geese Police, Inc.

7          Q.      Geese Police, Inc. is a corporation,

8   correct?

9          A.      Yes.

10         Q.      Are you a shareholder of Geese Police,

11  Inc.?

12         A.      I'm 100 percent, yes.

13         Q.      Okay, so you're the sole and exclusive

14  shareholder; is that correct?

15         A.      Yes.

16         Q.      Okay.  In your role as president of

17  Geese Police, Inc., what are your day-to-day duties

18  and function, if any?

19         A.      I basically oversee the operation

20  between my four managers and myself.

21         Q.      And what is the business of Geese

22  Police, Inc.?

23         A.      Repeat that, please?

24         Q.      What is the business of Geese Police,

25  Inc., what do they do or did they do?

13

1          A.      They herd -- they herd geese off of

2    corporate part of parks, school yards, cemeteries,

3    playgrounds, city parks.

4          Q.      What are the what I'll call

5    "territorial limitations" of Geese Police, Inc.?

6          A.      I didn't understand that question.

7          Q.      Fair enough.  It's probably a poorly

8    worded question.

9                  Where does Geese Police, Inc. operate?

10         A.      Right now, the home office is at 5050

11   West Hurley Pond Road in Wall, New Jersey.

12         Q.      Okay.  As I understand from Mr. Rapsys

13   and Mr. Brown, the herding occurs at the corporate

14   parks and the cemeteries and school grounds or

15   whatever the other options are.  What are the --

16   sort of what territory does Geese Police operate

17   that business in?

18         A.      New Jersey and the five boroughs of

19   New York.

20         Q.      How long have you served as president

21   of Geese Police, Inc.?

22         A.      Since my husband's death in January of

23   '22.

24         Q.      Prior to that, did you have any role at

25   Geese Police, Inc.?

14

1        A.      No.

2        Q.      With respect to GPI, LLC, I understand

3   you're currently president, have you always been

4   president?

5               MS. JANKOWSKI:  Objection to form.

6        Q.      You can answer.

7        A.      GPI, did you say?

8        Q.      Correct, yes.

9        A.      No.  I was 50 percent shareholder.

10       Q.      Okay.  Prior to your husband's passing,

11  did you have any operational role at GPI, LLC?

12       A.      No.

13       Q.      Is it fair to say that your husband was

14  in full operational control of GPI, LLC before his

15  passing?

16       A.      Yes.

17       Q.      And is it fair to say you took over

18  that role from him upon his passing?

19       A.      Yes.

20       Q.      Okay.  Did you have any title at GPI,

21  LLC prior to his passing?

22       A.      No.

23       Q.      Do you know who Vid Rapsys is?

24       A.      Who?  Sorry?

25       Q.      Do you know who Vid Rapsys is?

15

1          A.      Yes.

2          Q.      Okay.  When was the first time you met

3   Mr. Rapsys?

4          A.      Probably 2012/2013, I'm not sure.

5   Right after I was married to Dave Marcks.

6          Q.      Have you ever operated -- strike that.

7                  Have you ever been involved in the

8   actual operation of herding geese with border

9   collies?

10         A.      Service with my husband, yes.

11         Q.      Is it fair to say he was active in the

12  actual operation of geese herding?

13         A.      Yes, I was.

14         Q.      Are you familiar in that role with the

15  general commands that are given to border collies to

16  remove geese from property?

17         A.      Yes.

18         Q.      Prior to your husband's passing, were

19  you an employee of Geese Police, Inc.?

20         A.      No.

21         Q.      Were you attending those service calls,

22  and I don't say merely in this way, but merely as

23  the spouse of Mr. Marcks?

24         A.      Yes.

25         Q.      To your knowledge, what is GPI, LLC,

16

1    and by that, I mean what does GPI, LLC do, what does

2    it offer, et cetera?

3               MS. JANKOWSKI:  Objection to form.

4               MR. GOLDMAN:  That's fine.  You can

5    answer.

6         A.    I don't think I quite understand your

7    question, but that would be the franchise section of

8    Geese Police operation.

9         Q.    Okay.  And if one becomes a franchisee

10   of GPI, LLC, what do they receive from GPI?

11        A.    Receive one-on-one training -- well,

12   at the time, it was with my husband David at the

13   farm where we keep our dogs and our animals for

14   training.  They would spend several days at the

15   farm, if not a week or two; they would go to various

16   locations, my husband would take them to various

17   locations where there was geese and he would show

18   them the procedures for herding the geese; he would

19   spend time in the state or area where the franchise

20   is to show them how to look for business, how to

21   call upon customers; they would search the area for

22   potential customers; he would go over the training

23   with the dogs and the commands as well.

24        Q.    Thank you for that information.

25        A.    You're welcome.

1         Q.      To your knowledge, when did Mr. Rapsys

2    become a franchisee of GPI, LLC?

3         A.      Did you say what time?

4         Q.      When, what time frame, approximately,

5    yes.

6         A.      I don't know.  I know it began

7    probably the end of '98 and into '99, I'm not sure

8    exactly when he came under contract.

9         Q.      And that's fine.  Thank you.

10                To your knowledge, what training or

11   guidance was Mr. Rapsys provided in 1998 or 1999

12   when he became a franchisee?

13        A.      I only know what I've read and he

14   spent -- one or two times, he was at the farm where

15   we keep Geese Police dogs and we do the training,

16   the final training on all border collies before

17   they're put on the road.  I know he spent time,

18   maybe one or two weeks, in Farmingdale at the farm

19   and I know Dave spent one or two visits to his

20   properties and taught him how to approach customers,

21   to look for business, to look for geese.  That's all

22   I know.

23        Q.      And is that independent knowledge you

24   have or is that based on your reading of the

25   deposition transcripts you reviewed in advance of

18

1    today's deposition?

2           A.     Both.  I was well aware of the

3    situation with Vid, and my husband and I spoke many

4    times on the situation with Vid and his

5    relationship, and I did have the opportunity to meet

6    Vid in person.

7           Q.     When was that, approximately?

8           A.     It was more than once, on the various

9    conferences that Geese Police hold.

10          Q.     Okay.  And you said you had a number of

11   conversations with your late husband regarding Mr.

12   Rapsys.  Can you tell me about that?

13          A.     Well, in the beginning, Dave was very

14   proud of him and he was -- he had reached the

15   highest producing franchise at one time, maybe even

16   twice, but then the relationship got sour and our

17   conversations at that point were private.

18          Q.     I'm not sure I understand that comment.

19   If you had conversations -- and I'm only asking

20   about conversations with respect to Mr. Rapsys, I

21   don't care about anything else, obviously.  I think

22   there's ample reason for you to provide that

23   information, so if you had conversations with Mr.

24   Marcks prior to his passing regarding Mr. Rapsys

25   other than the one you just referenced, can you tell

19

1    me about those?

2         A.    He had reached his point where it was

3    all over, there was no more talking, there was no

4    more accepting the fact that he was irresponsible,

5    and my husband had reached his point where it was

6    going to end.

7         Q.    What was going to end?  I'm sorry.

8         A.    The relationship and the franchise.

9         Q.    Okay, and approximately when was it

10   accepted to end?

11        A.    He was very sick, so it was an ongoing

12   conversation.  I would imagine that he thought he

13   was -- would, at one point, get better and address

14   the situation himself with Vid.

15        Q.    To your knowledge, did Mr. Marcks ever

16   express any of this to Mr. Rapsys directly?

17        A.    Oh, many times.

18        Q.    To your knowledge, were these

19   conversations or communications by phone, e-mail,

20   text message, fax, something else?

21        A.    Well, I can only attest to the fact

22   that I heard the conversations, so there was verbal

23   conversations, and of course, I did see that there

24   were some e-mails or messages, text messages, as

25   well.

20

1          Q.     Do you know approximately how

2     conversations they had, verbal conversations?

3          A.     Over the years?

4          Q.     No, sorry, strike that.  Do you know

5     approximately how many verbal conversations they had

6     after Mr. Marcks decided he was going to end the

7     franchise relationship with Mr. Rapsys?

8          A.     I'd say I was witness to two or

9     possibly three verbal messages or telephone

10    conversations.

11         Q.     Perfect.  Thank you.

12                Pry to his passing, is it fair to say

13    that your husband was an expert in the geese-herding

14    space?

15         A.     He was the first -- the original in

16    the concept, yes.  Excellent.

17         Q.     Going back for a second to the

18    conversations regarding Mr. Rapsys, did you and Mr.

19    Marcks ever discuss Mr. Rapsys attempting to

20    renegotiate his contractual relationship with GPI,

21    LLC?

22         A.     To my knowledge, no.

23         Q.     And so you wouldn't be aware that if

24    they were having these conversations in 2017 or 2018

25    or so on, that there were ongoing conversations?

21

1        A.      Yes.  Just my husband's side of it, I

2   heard.

3        Q.      Okay, and what was your husband's side

4   of these negotiations over the contractual

5   relationship?

6               MS. JANKOWSKI:  Objection to form.

7   You may answer.

8        A.      Very verbal disapproval and discussed

9   his performance, Vid's performance.

10        Q.      Okay, and what was discussed -- I think

11   that was the word you used -- with Vid's

12   performance?

13        A.      He wasn't performing at all; he wasn't

14   sending any of his reports, he wasn't sending in his

15   payment for the service, he wasn't paying his life

16   insurance, he wasn't paying for dogs he owed for

17   years, and he wasn't paying on the checks that he

18   deposited in his account that were New Jersey Geese

19   Police checks, and to date, they are still open.

20        Q.      Subsequent to the franchise agreements

21   expiring in 2019, what services did GPI, LLC provide

22   to Mr. Rapsys or his entity?

23        A.      He had benefit of the internet with

24   the main office, he had all the sales leads that

25   were sent to him from the main office, and like I

22

1    said, he was -- his bills were getting paid from

2    Geese Police and he wasn't paying for them, but we

3    still paid for them.

4         Q.    Okay, so -- I'm just going to break

5    that down a little bit.  So I understand there's

6    some life insurance policy that was purchased for

7    Mr. Rapsys that was paid for -- strike that.

8              I understand there was some life

9    insurance that Mr. Rapsys had, either for himself or

10   for his employees, that required payment; is that

11   correct?

12        A.    Correct.

13        Q.    And it's your testimony that, at some

14   point in time, he didn't pay the entirety of the

15   amounts owed.

16        A.    That's correct.

17        Q.    Okay.  Then there are actual physical

18   dogs that were purchased from GPI; is that correct?

19        A.    Correct.

20        Q.    Okay.  And it's your testimony that he

21   didn't pay for some or all of those dogs; is that

22   correct?

23        A.    After five years, he made the final

24   payment on the last dog he purchased, I believe that

25   was two or three months ago, he finally made the

23

1    payment after five years.

2          Q.    And that's during the pendency of this

3    litigation?

4          A.    Pardon me?

5          Q.    And he made that payment during the

6    pendency of this litigation?

7          A.    Yes.

8          Q.    Okay.  All right, so we got dogs.  At

9    the beginning of your answer a minute ago, and I

10   didn't hear you so I apologize, either the benefit

11   of the internet or the intranet and I'm not sure

12   which word you used.

13         A.    The internet, the website.

14         Q.    Oh, okay.  And what's the benefit of

15   the website to Mr. Rapsys from 2019 forward?

16         A.    Geese Police is the most well-known,

17   the first, largest business in the herding of geese.

18   It's throughout the whole United States, well known.

19         Q.    Did you mention "sales leads" a minute

20   ago; is that right?

21         A.    I'm sorry, what?

22         Q.    Did you mention sales leads a minute

23   ago?

24         A.    Yes.  He was given constant sales

25   leads.  They would call the home office and they

24

1    would be forwarded to Vid's office, yes.

2         Q.    Do you know approximately how many

3    sales leads were provided to Mr. Rapsys during the

4    entire course of his franchise relationship with

5    GPI?

6         A.    No, I don't.

7         Q.    Would you say it's more or less than

8    ten?

9         A.    Many more.

10        Q.    Okay.  More or less than 50?

11        A.    That's hard for me to estimate, but

12   I'd say that's a good estimate.

13        Q.    Approximately 50?

14        A.    Sure.

15        Q.    Okay.  Of those approximately 50 leads,

16   how many were converted to clients, to your

17   knowledge?

18        A.    I do not know, I have no knowledge of

19   what he did with our leads.

20        Q.    Are you familiar with any of those

21   leads converting into actual clients?

22        A.    I know the last one that the office

23   sent him, he didn't respond to because the customer

24   didn't call the home office back, so that's my only

25   knowledge.

25

1        Q.      If I'm understanding you correctly,

2  you're not familiar with whether any of them

3  converted to leads, but you are familiar with at

4  least one where Mr. Rapsys allegedly didn't respond

5  to the prospective client?

6        A.      That's correct.

7        Q.      Do you know approximately when that

8  lead and nonresponse occurred?

9        A.      No.

10       Q.      Okay.  Would you say it's before or

11 after February of 2019?

12       A.      February what?

13       Q.      Of 2019.

14       A.      It was definitely after that, yes.

15       Q.      Okay.  So there were sales leads that

16 came through GPI, there were dogs that came through

17 GPI or its affiliate and there was life insurance

18 policies.  What other benefits were provided to Mr.

19 Rapsys or his entity from February of 2019 forward?

20       A.      Well, he continued to purchase our

21 uniforms, jackets, hats, whatever.

22       Q.      That was after the franchise agreement

23 expired in February of 2019?

24       A.      Yes.

25       Q.      Do you know approximately how many

26

1    jackets or hats or uniforms he purchased after

2    February of 2019?

3          A.     No, I don't.

4          Q.     Do you know if he paid for those

5    jackets or hats or uniforms that he purchased after

6    2019?

7          A.     I believe the invoice is still open.

8          Q.     Okay.  When the litigation that you're

9    here testifying for was filed, you were the sole

10   member of GPI, LLC; is that correct?

11         A.     Yes.

12         Q.     And you were paying the litigation

13   bills -- strike that.

14                And GPI, LLC was paying the litigation

15   bills associated with the litigation?

16         A.     Yes.

17         (Background noise)

18                MR. GOLDMAN:  I hear someone speaking.

19                MS. JANKOWSKI:  You're hearing people

20   outside the door and in the lobby, that's what's

21   going on.

22                MR. GOLDMAN:  Oh, okay.

23                MS. JANKOWSKI:  Sorry.

24                MR. GOLDMAN:  No, it's okay.  Can you

25   guys hear me okay?

27

1          MS. JANKOWSKI:  Yeah, we can hear you

2     fine, but that's what -- nobody in this room was

3     talking, you're getting background noise, Evan,

4     sorry.

5          MR. GOLDMAN:  No, it's okay.  Thank

6     you so much.

7          Q.     So when the litigation was commenced in

8     July of 2022, you were the sole member, but you're

9     no longer the sole member of GPS, LLC, correct?

10         A.     Yes.

11         Q.     Who is responsible for the legal fees

12    associated with this litigation, you or Mr. Neveras?

13         MS. JANKOWSKI:  Objection to form.  Go

14    ahead.  You may answer.

15         A.     I said I am.

16         Q.     Although you no longer own GPI, LLC,

17    you are still funding a litigation against Mr.

18    Rapsys; is that correct?

19         A.     Yes.

20         Q.     Can I ask you why?

21         A.     It's my responsibility.

22         Q.     Okay.  But you no longer own GPI, LLC,

23    correct?

24         A.     No.

25         Q.     And do you have any financial interest

28

1    in the ongoing operations of GPI, LLC --

2         A.    No.

3         Q.    So -- and this is purely hypothetical,

4    but if GPI, LLC sold a hundred franchises next year

5    and made $10 million, you would get zero of that; is

6    that correct?

7         A.    Correct.

8         Q.    So what is your incentive, if any, to

9    fund a litigation against a person who is a

10   franchisee of an entity over which you currently

11   have zero operational or financial interest?

12        A.    When the litigation started, I never

13   expected it to be so prolonged, but of course, I do

14   -- do realize and did realize and understood that we

15   were going through the most difficult times ever

16   with the COVID situation and shutdown.

17        Q.    Okay.  Do you know approximately how

18   much money you and/or GPI have spent in furtherance

19   of this litigation?

20        A.    Well over a hundred-thousand dollars.

21        Q.    Okay.  How long, to your knowledge, has

22   GPI or Geese Police, Inc. used the law firm of

23   Buchanan, Ingersol & Rooney?

24        A.    Well, I believe they were -- I'm not

25   sure, but I believe they were the ones that

29

1    initially formed the contracts for GPI and GPI.

2         Q.     Are you saying back in the late '90s?

3         A.     Yes.

4         Q.     To your knowledge, have they

5    consistently been your -- strike that.

6                To your knowledge, have they

7    consistently been GPI and Geese Police, Inc.'s

8    counsel, since that time frame?

9         A.     Yes.

10        Q.     Without going into any of your

11   conversations with counsel, and counsel will stop

12   you where she thinks the line should be drawn, what

13   is your hope or intention for moving forward with

14   this litigation now that you no longer have a

15   financial interest in GPI, LLC?

16        A.     My original intent was to stop what I

17   would fear to be a cancer in the business, which I'm

18   afraid is at this point, and that's why I started --

19   or tried to stop it.

20        Q.     Okay.  And I can appreciate that, but

21   since you gifted the business to Mr. Marcks's nephew

22   at the beginning of this year, does the outcome have

23   any impact on you whatsoever anymore?

24        A.     Yes.

25        Q.     In what sense?

30

1        A.      I hope to recoup some of the expense

2    of this litigation, number one, and prevent --

3    prevent this occurring in the future for my nephew.

4        Q.      Okay.

5                MR. GOLDMAN:  Can we take a two-minute

6    break, like a bathroom break?

7                MS. JANKOWSKI:  Sure.

8                MR. GOLDMAN:  Michele, off the record

9    for a second.

10        (Off-the-record discussion)

11        (Recess taken)

12                MR. GOLDMAN:  Back on the record.

13   BY MR. GOLDMAN:

14        Q.      Ms. Marcks, one question about -- you

15   said you were hoping to recoup some of your legal

16   expenses as part of this litigation.  Do you have an

17   arrangement with Mr. Neveras that if there is a

18   payment of any amount from Mr. Rapsys or his entity

19   to GPI, LLC that you would get some of that money?

20        A.      What was owed to our office, yes.

21        Q.      And what do you mean by owed to your

22   office?  I'm sorry.

23        A.      During the time that we were the owner

24   of GPI.

25        Q.      And by that, you mean the, and I think

31

1   you mentioned uniforms and --

2          A.     That money that Vid owed the business,

3   yes.

4          Q.     And do you have an approximation of how

5   much money that is?

6          A.     I lost track.  No.  At this point, no.

7          Q.     Would you say it's more or less than

8   $50,000?

9          A.     Yes.

10         Q.     More or less?  I'm sorry.

11         A.     More.

12         Q.     Okay.  More or less than a hundred-

13   thousand dollars?

14         A.     Less than a hundred.

15         Q.     Okay, so if you were to recoup

16   somewhere between 50 and a hundred-thousand dollars

17   from Mr. Rapsys as part of this litigation, you have

18   an agreement with Mr. Neveras that that money would

19   be paid to you as an individual; is that correct?

20                MS. JANKOWSKI:  Objection to form.

21         A.     I am a little confused at that

22   question.

23         Q.     Sure.  Let me rephrase it.

24                So the lawsuit here is brought by GPI,

25   LLC, correct?

32

1        A.      Yes.

2        Q.      You, Diane Marcks, are not a party to

3    the litigation, correct?

4        A.      Repeat that again?

5        Q.      Sure.

6        A.      Because I'm confused.  I'm totally

7    confused.

8        Q.      Okay.  You, Diane Marcks, are not a

9    party to the litigation; is that correct?

10       A.      No, I am.  I believe I am.

11       Q.      Hold on one sec.  Let's see if I could

12   screen share here.

13               Ms. Marcks, can you see that?

14       A.      Yes.

15       Q.      Okay.  And this is the lawsuit -- for

16   the record, it's Exhibit D-3, which is Document 1

17   filed in case No. 2:22-cv-04585.  Do you see that?

18       A.      No.

19       Q.      Do you not see -- is it not on the

20   screen in front of you?  I'm sorry.

21               MS. JANKOWSKI:  It's on the screen,

22   but I don't think she understands your question.

23               MR. GOLDMAN:  Thank you, Gretchen.

24               MS. JANKOWSKI:  It's on the screen,

25   she can see it.

33

1          MR. GOLDMAN:  Thank you.

2     Q.     Do you see the words here, in the

3 middle, "Verified Complaint"?

4     A.     Yes.

5     Q.     And do you understand that this is the

6 filing or the pleading that started the litigation

7 against Mr. Rapsys?

8     A.     Yes.

9     Q.     Okay.  And if you look here, there is a

10 singular plaintiff, GPI, LLC, correct?

11     A.     Yes.

12     Q.     Okay.  You individually, Diane Marcks,

13 are not party to this litigation, correct?

14     A.     Individually?

15     Q.     Correct.

16     A.     Yes.

17     Q.     Okay.  You are not a co-plaintiff, for

18 instance, in this case, correct?

19     A.     Correct.

20     Q.     Okay.  So if, for instance, a judgment

21 was issued in favor of GPI, LLC that said Mr. Rapsys

22 had to pay some amount of money, who would get paid

23 that money in this lawsuit, to your knowledge?

24          MS. JANKOWSKI:  Objection to form.

25 You may answer.

34

1      A.      I would expect to recoup what he owed

2   us, what Vid Rapsys owed us.

3      Q.      Okay.  And I'm going to get into that

4   in one second, but I guess what I'm asking is:   A

5   judgment in this case would result in Mr. Rapsys

6   being required to pay GPI, LLC some amount of money,

7   a dollar, a million dollars, whatever the number is,

8   correct?

9              MS. JANKOWSKI:  Objection to form.

10     A.      Yes.

11     Q.      Okay.  Is there an agreement with Mr.

12  Neveras, who is now the sole and exclusive member of

13  GPI, LLC, that he would reimburse you for your costs

14  as a result of any such award in this litigation?

15     A.      I have not had that conversation with

16  him yet.

17     Q.      So, hypothetically, if an award came

18  down for -- I'm going to make up a number -- $10,000

19  and Mr. Rapsys paid GPI, LLC $10,000, you have no

20  agreement with Mr. Neveras that you would get some

21  or all of that $10,000?

22     A.      Not yet.

23     Q.      And you said the amount that you think

24  is outstanding is between 50 and a hundred-thousand

25  dollars, approximately, correct?

35

1       A.      It's an estimate, yes.

2       Q.      Okay.  And that's made up of the checks

3   from JLL, which you mentioned earlier, uniforms,

4   which you mentioned earlier.  What other categories

5   of obligations fall within that -- within that 50 to

6   a hundred-thousand dollars, approximately?

7       A.      The sales commission that he didn't

8   pay and also the life insurance, which I believe

9   he's current on.

10      Q.      When you say "the sales commission,"

11  you mean the royalty?

12      A.      Yes, the royalties.

13              MR. GOLDMAN:  Give me one moment.

14      (Pause)

15      Q.      Did you review this document, which is

16  the Verified Complaint, before it was filed?

17      A.      No.

18      Q.      Even though at the time, you were the

19  sole and exclusive member of GPI, LLC?

20      A.      Yes.

21      Q.      And just in case you're unaware, it was

22  filed on July 14 of 2022.  Do you see that?

23      A.      Yes.

24      Q.      Okay.  What is your understanding of

25  the request or the relief being sought by way of

36

1    this Verified Complaint?

2        (Pause)

3        Q.    Do you understand the question?  I'm

4    sorry.

5        A.    You can repeat the question.

6        Q.    Sure.  So what is your understanding of

7    what relief is being sought by GPI as a result of

8    this Verified Complaint?

9        A.    That he would stop using the marks of

10   Geese Police, that we would recoup the money he owed

11   us and he would -- he would not do any more harm to

12   the GPI franchises.

13       Q.    Are you familiar with an arbitration

14   that was filed by GPI, LLC against Mr. Rapsys and

15   his entity?

16       A.    Yes.

17       Q.    Okay.  To your understanding, what is

18   the difference in the relief being sought in that

19   arbitration versus this litigation, if any?

20       A.    I'm not sure.

21       Q.    Okay.  If you look at the -- this is

22   the Prayer For Relief; for the record, it's Page 21

23   of the Verified Complaint of Exhibit D-3.  There are

24   certain categories, A through I, of requests as part

25   of the litigation.  Do you see that?

1          A.      Yes.

2          Q.      Okay, and I'm going to go slowly so you

3    could see them.  Right on the screen now is A, B and

4    C.  Are any of these, to your knowledge, seeking

5    dollar amounts to be paid by Mr. Rapsys to GPI, LLC?

6          A.      Well, that would have to be

7    considered.  Off the top of my head, no.

8          Q.      Okay.  So is it fair to say that other

9    than legal fees, this litigation does not seek any

10   money from Mr. Rapsys?

11         A.      That's not true.

12         Q.      Okay.  What does it seek?

13         A.      The money that he still owes.

14         Q.      Okay.  It's your understanding that the

15   litigation pending in the United States District

16   Court for the District of New Jersey is seeking

17   reimbursement of the monies that Mr. Rapsys owes,

18   other than legal fees.

19         A.      Well, according to our contract, we

20   had the right to audit his books, which was never

21   done, so what he owes is questionable at this point.

22         Q.      Okay.

23         A.      We were never -- we never reached the

24   point where we were allowed to review his books, and

25   he was not sending in his sales reports as required.

38

1          Q.     Okay.  And it's your understanding that

2     if you were to succeed in this litigation, "this

3     litigation" being the District of New Jersey

4     litigation, that Mr. Rapsys would have to reimburse

5     you for the royalties and other amounts that are due

6     and owing; is that correct?

7          A.     Yes.

8          Q.     Do you have any agreement with Mr.

9     Neveras as to who controls the decision-making for

10    the litigation?

11         A.     This litigation is my -- under my

12    control.

13         Q.     Meaning, and I'm just saying

14    hypothetically here, if Mr. Neveras said "Uh, I want

15    to settle this, I'll take $1," he couldn't do that

16    without your agreement.

17         A.     Correct.

18                MS. JANKOWSKI:  Objection to form.

19         Q.     Is this agreement in writing anywhere?

20         A.     I'm sorry, what did you say?

21         Q.     Is your agreement with Mr. Neveras that

22    you have full control over the litigation in writing

23    anywhere?

24         A.     No.

25         Q.     Was it part of the transfer of

39

1    membership interest or the gifting of membership

2    interest documents that were signed when the company

3    was gifted to Mr. Neveras?

4         A.    No.

5         Q.    This is a verbal understanding that you

6    and Mr. Neveras have?

7         A.    Yes.

8         Q.    When did you and Mr. Neveras come into

9    agreement as to this understanding?

10        A.    There were many conversations on it.

11   I spoke with him just two nights ago.

12        Q.    And what did you and Mr. Neveras speak

13   about two nights ago?

14        A.    Well, we were discussing what's

15   happening in GPI.

16        Q.    Do you mean what's happening in GPI in

17   terms of this litigation or the entities, just

18   general --

19        A.    Well, the entity.

20        Q.    And what's happening in GPI that you

21   and Mr. Neveras discussed?

22        A.    There seems to be a lot of problems

23   that developed because of this litigation that I

24   blame Vid for.

25        Q.    So going back to Page 1 of the

40

1    litigation, of the Verified Complaint, GPI is the

2    plaintiff here, correct?

3         A.    Yes.

4         Q.    And to your knowledge, that means GPI

5    filed a lawsuit against Mr. Rapsys, correct?

6              MS. JANKOWSKI:  Objection to form.

7    You may answer.

8         A.    Yes.

9         Q.    Okay.  Did Mr. Rapsys, to your

10   knowledge, file a lawsuit against GPI?

11        A.    No.

12        Q.    Okay.

13        (Technical difficulty)

14        Q.    Is it fair to say that GPI initiated

15   the litigation, or litigation and arbitration,

16   against Mr. Rapsys and not the other way around,

17   correct?

18        A.    Yes.

19        Q.    Okay.  I'll pull up another document;

20   give me a moment.

21             Ms. Marcks, I'm showing you what's been

22   marked as Exhibit D-6, Rapsys 194, for

23   Identification.  Have you seen this document before?

24   And just tell me if you need me to scroll up or

25   down.

41

1          A.      Yes.

2          Q.      Yes, you've seen this document before?

3          A.      Yes.

4          Q.      Okay.  And if we scroll down, this is a

5     letter -- I'm just trying to zoom out -- from you to

6     someone named Patty Deering.  Do you see that?

7          A.      Yes.

8          Q.      Okay.  And it says Ms. Deering is a

9     Community Association Manager in Plainfield,

10    Illinois.  Do you see that?

11         A.      I didn't -- you mumbled, I didn't hear

12    that.

13         Q.      Sorry.  It says that this is a -- I'm

14    sorry, it says that Ms. Deering, or Mr. Deering, is

15    a Community Association Manager in Plainfield,

16    Illinois; is that correct?

17         A.      Yes.

18         Q.      And this is a letter you sent on July

19    19 of 2022, correct?

20         A.      Correct.

21         Q.      Which is approximately five days after

22    the Verified Complaint was filed in litigation

23    you're testifying in today; is that correct?

24         A.      I'm not clear.

25         Q.      So I'll pause this and do a new share.

42

1    Do you see the Verified Complaint on the screen now?

2          A.    Yes.

3          Q.    And if you look at the very top here,

4    it says "file date."  Do you see that?

5          A.    Yes.

6          Q.    And that's July 14 of 2022, correct?

7          A.    Yes.

8          Q.    Okay, so five days before the letter

9    that's been marked as Exhibit D-6, correct?

10         A.    Yes.

11         Q.    Okay.  And is it fair to say that this

12   is you sending a letter to -- strike that.

13               To your knowledge, who is or was Patty

14   Deering?

15         A.    Repeat that, please?

16         Q.    To your Honor, who is or was Patty

17   Deering?

18         A.    The manager of the -- Community

19   Association Manager, yes.

20         Q.    Okay, and why would you be sending this

21   to Patty Deering?

22         A.    To notify her of the -- that Rapsys

23   was no longer affiliated with Geese Police.

24         Q.    And why were you doing that?

25         A.    Because it was our intentions to make

43

1   sure that all of the Geese Police contracts that Vid

2   had be serviced.

3          Q.     Were you aware of Mr. Rapsys not

4   servicing any of the contracts?

5          A.     No, we had no knowledge.

6          Q.     So fair to say you had no knowledge of

7   any contracts that weren't being serviced, correct?

8          A.     We had no knowledge whether he was

9   servicing any of the accounts he had on file.

10         Q.     To your knowledge, how did you get

11  Patty Deering's information?

12         A.     From our web -- from our system.

13         Q.     Okay.  And --

14         A.     From our system.

15         Q.     And why were they in your system?

16         A.     It's part of procedure.

17         Q.     Okay.  To your knowledge, were they a

18  customer of Mr. Rapsys?

19         A.     Yes.

20         Q.     To your knowledge, did you send out

21  more than just one letter to other customers of Mr.

22  Rapsys?

23         A.     Yes.

24         Q.     Do you know approximately how many

25  customers you sent this type of letter to?

44

1          A.      No, I don't remember.  Maybe 20.

2          Q.      Okay.  As a result of the letter to

3    these approximately 20 clients, did you begin

4    servicing any of these clients?

5          A.      No.

6          Q.      Thank you.

7                  You mentioned earlier that you were

8    hoping that this litigation would stop -- and I'm

9    paraphrasing -- stop Mr. Rapsys from causing harm or

10   doing any more harm to the franchisees.  Do you

11   remember that?

12         A.      Yes.

13         Q.      Okay.  What did you mean by that?

14         A.      Because he was complaining and letting

15   several of the other franchises know that he was not

16   going to pay the royalties and that we were in

17   litigation.

18         Q.      Okay.

19         A.      And...

20                 MS. JANKOWSKI:  Are you finished?

21         Q.      I'm sorry, keep going.

22         A.      And they were using our marks, they

23   were servicing, we found out, the accounts, and they

24   were waiting to see what would happen in Vid's trial

25   and how he fared out.

45

1        Q.      Understood.  You said that Mr. Marcks

2    -- I'm sorry, strike that.  Excuse me.

3               You said Mr. Rapsys was telling other

4    people that GPI sued him, correct?

5        A.      Yes.

6        Q.      But that had to have -- naturally, it

7    would have had to have occurred after the suit was

8    filed, correct?

9        A.      Yes.

10       Q.      Okay.  So you didn't file the suit in

11   order to stop Mr. Rapsys from talking about the

12   suit; is that fair to say?

13              MS. JANKOWSKI:  Objection to form.

14       A.      I didn't understand that question.

15       Q.      Fair enough.  You didn't file a lawsuit

16   on July 14 to stop Mr. Rapsys from discussing a

17   lawsuit which, on July 13, hadn't been filed as of

18   yet, correct?

19       A.      Correct.

20       Q.      And to the extent you hadn't sued Mr.

21   Rapsys, you wouldn't have -- strike that.  I'll

22   withdraw that question.

23              You mentioned other franchisees

24   desiring to -- or watching what happened with Mr.

25   Rapsys; is that correct?

46

1          A.      Yes.

2          Q.      Approximately how many other

3     franchisees do you believe are watching what happens

4     here to decide their own outcome?

5          A.      Six.

6          Q.      Six.  And who are those six?

7          A.      Dave Swickard.

8          Q.      Okay.

9          A.      Doug Marcks.

10         Q.      Okay.

11         A.      Rich LaPorta.

12         Q.      Okay.

13         A.      You're putting me on the spot.  I

14    don't remember the last name, I'm sorry.

15         Q.      So if I understood you correctly, you

16    said there were six franchisees --

17         A.      Yeah, the Wyatts, that's five, and

18    Elliott, Elliott Aran (phonetic), that's six.

19         Q.      You just can't remember one of them; is

20    that fair?

21         A.      No, I think I named all six.

22         Q.      So correct me if I'm wrong, I have

23    Swickard, Marcks, LaPorta, Wyatt, Elliott something.

24         A.      Yeah, Elliott and Rich LaPorta.

25         Q.      So I'm going to go slowly.  Swickard,

47

1   Doug Marcks, LaPorta, the Wyatts and Elliott.

2   That's five.

3          A.      Our Massachusetts office, I forget his

4   name.

5          Q.      Okay.  That's fair.

6          A.      I'm sorry.

7          Q.      Nope, that's fine.

8                  So you believe that these six

9   franchisees are watching to see what happens with

10  Mr. Rapsys's case to make a decision as to their own

11  relationship with GPI?

12         A.      Correct.

13         Q.      What impact, if any, would -- if all

14  six of them decided to leave the system, what

15  impact, if any, would that have on you, Ms. Marcks?

16         A.      On me directly?

17         Q.      Correct.

18         A.      None.

19         Q.      That's because you have no financial

20  interest in GPI, LLC, correct?

21         A.      Well, I think I need to -- they're

22  operating under the Geese Police marks, which I

23  still own, and Vid was using the Geese Police marks

24  while claiming he wasn't under contract, and that is

25  what I am concerning myself with and I will do

48

1    everything to protect those marks, or the use of

2    those marks.

3            Q.    Okay.  To your knowledge, as of today,

4    is Mr. Rapsys using the Geese Police marks in any

5    way?

6            A.    As what?

7            Q.    To your knowledge, as of today, is Mr.

8    Rapsys using the Geese Police marks in any way?

9            A.    Today, no.  He still has Geese Police

10   active, however.

11           Q.    What do you mean by that?  I'm sorry.

12           A.    It's still recorded that he's still

13   active with Geese Police.

14           Q.    Recorded where?  I'm not following.

15           A.    The State of Illinois.

16           Q.    It's your testimony that in the State

17   of Illinois, Mr. Rapsys is still designated with

18   Geese Police?

19           A.    Yes.

20           Q.    As of today, May 24, 2023?

21           A.    I don't know today specifically, but

22   it was as of a week ago, yes.

23           Q.    Okay, that's fair.

24                 Other than that, fair to say Mr. Rapsys

25   is not using the Geese Police marks in any way,

49

1    correct?

2            A.      As far as I know, yes, correct.

3            Q.      Understood.  And with respect to the

4    six franchisees -- rather than name them, I'll just

5    call them "the six franchisees," if that's okay with

6    you.  Are they currently using the Geese Police

7    marks?

8            A.      I believe so.

9            Q.      Are they all permitted to do so, either

10   contractually or otherwise, at the moment?

11           A.      As of this -- today, I believe they

12   have, yes, for a couple more days, yes.

13           Q.      Okay.  And so no one, to your

14   knowledge, has misused the Geese Police marks as a

15   result of Mr. Rapsys, correct?

16           A.      No, that's not correct.

17           Q.      Okay.  Who has misused the Geese Police

18   marks as a result of Mr. Rapsys?

19           A.      Doug Marcks.

20           Q.      Okay, and how has Doug Marcks misused

21   the Geese Police marks?

22           A.      He's still -- he's still under

23   contract with Geese Police to customers and on his

24   vehicles and his invoicing.

25           Q.      Okay, my understanding from your

50

1   testimony a moment ago is, as of today, Mr. Marcks

2   still has a license, pursuant to a franchise

3   agreement or otherwise, to use the Geese Police

4   marks; is that correct?

5        A.    Well, he's not under contract.  Maybe

6   "license" and "contract" is confusing me but --

7        Q.    That's fair.

8        A.    -- he -- no as of -- my knowledge, as

9   of today, he is not under contract and still using

10  the Geese Police marks.

11       Q.    Okay.  And do you have any familial

12  relationship with Mr. Marcks, Doug Marcks in this

13  case?

14       A.    He's my nephew.

15       Q.    Have you sent -- strike that.

16             Has anyone on behalf of the Geese

17  Police marks sent Doug Marcks a cease and desist

18  with respect to his purported misuse of the Geese

19  Police marks?

20       A.    Yes.

21       Q.    Okay.  What was sent to Mr. Marcks?

22       A.    The letter.

23       Q.    And --

24       A.    That he's in default and to cease and

25  desist.

51

1       Q.      He's in default of what?

2       A.      Of our agreement, and he was not -- he

3  refused to sign a new contract pending the

4  litigation of Vid Rapsys.

5       Q.      So did his franchise agreement expire?

6       A.      Yes.

7       Q.      And it was not renewed?

8       A.      Yes.

9       Q.      And it's your testimony that Mr. Marcks

10 continued using the Geese Police marks after the

11 expiration of his franchise agreement?

12      A.      Yes.

13      Q.      When you said you sent him a notice of

14 default or a letter of default, default of what --

15 he was in default of what document or what

16 agreement?

17      A.      Not signing -- renewing or signing the

18 contract or renewal and while still operating with

19 the Geese Police marks.

20      Q.      Have you filed litigation against Doug

21 Marcks?

22              MS. JANKOWSKI:  I'm going to object --

23 I'm going to object and instruct her not to answer.

24 You're getting into privileged information at this

25 point.

52

1          MR. GOLDMAN:  I'm not asking if she

2     will or anything, I'm asking, as a factual matter,

3     is a litigation -- has a litigation been filed.  I

4     don't think there's any privilege to that fact.

5          MS. JANKOWSKI:  No, I'm going to

6     instruct her not to answer --

7          THE WITNESS:  Okay.

8          MS. JANKOWSKI:  -- the question.

9          MR. GOLDMAN:  Give me one moment.

10        (Pause)

11     Q.     Did you -- strike that.

12          When you were with GPI, LLC, did GPI,

13     LLC or yourself communicate with the franchisees

14     after litigation was filed against Mr. Rapsys to

15     notify them that that litigation had been filed?

16     A.     A letter was sent, yes.

17     Q.     Okay.  And what was the sum and

18     substance of that letter?

19     A.     That we were in dispute or in

20     litigation and -- I don't recall the wording.

21     Q.     Okay.  And do you recall approximately

22     how many days, weeks or months after the litigation

23     was filed that that document was sent?

24     A.     I don't recall.

25     Q.     To your knowledge -- strike that.

53

1          How many franchisees was that document

2    sent to, approximately?

3          A.     Approximately 12.

4          Q.     12 franchisees.  To your knowledge,

5    were you the first one informing those 12

6    franchisees that litigation had been filed against

7    Mr. Rapsys?

8          A.     I missed it, I'm sorry.

9          Q.     That's okay.  My question is:  Were you

10   the first to notify those 12 franchisees that a

11   litigation had, in fact, been filed against Mr.

12   Rapsys?

13         A.     Most likely.

14         Q.     Why did you notify those 12 franchisees

15   that it had been filed?

16         A.     I felt they needed to know.

17         Q.     How many franchisees does GPI have as

18   of today, to your knowledge?

19         A.     I believe 12; I'm not sure.

20         Q.     Who was in charge of sales to new

21   franchisees at GPI from January of 2022 to December

22   of 2022?

23         A.     The Wall Township office.

24         Q.     Any particular person or people?

25         A.     Jeremy Brown.

54

1          Q.     And was Jeremy Brown permitted to sell

2   a franchise on his own accord or did he have to get

3   your approval during that time period beforehand?

4          A.     No, he was not -- he did not sell.

5          Q.     Do you know the last time GPI sold a

6   franchise?

7          A.     I'm not sure.

8          Q.     Do you know the last time GPI was

9   registered with the State of Illinois to sell

10   franchises in the State of Illinois?

11          A.     I'm not sure.

12          Q.     Did GPI take any affirmative steps to

13   sell franchisees to the general public?

14                MS. JANKOWSKI:  Objection to form.

15          Q.     If you understood, you can answer.

16          A.     Would you repeat that?

17          Q.     Sure.  What affirmative steps did GPI

18   take to sell franchises to the general public?

19                MS. JANKOWSKI:  Same objection.

20                MR. GOLDMAN:  Understood.

21          A.     Well, there was several sources.  Our

22   website mostly.  My husband did trade shows, fairs,

23   he was guess speaker at many organizations, stuff

24   like that.

25          Q.     Did --

55

1          A.        (Indiscernible)

2          Q.        I'm sorry, please finish.

3          A.        No, that's it.

4          Q.        Since your husband's passing in January

5    of 2022, what efforts, if any, has GPI, LLC made to

6    sell franchisees to the general public?

7          A.        If we had an inquiry for a new

8    franchise, it was given to Craig Neveras because it

9    was my intention that he take over GPI and he should

10   be the one to handle any new inquiry.

11         Q.        In the 16 or so months since your

12   husband passed, have you had any inquiries for

13   franchisees?

14         A.        Have I had any?

15         Q.        Has GPI?

16         A.        (Indiscernible)

17                   COURT REPORTER:  I'm sorry, Ms.

18   Marcks, I didn't hear you.

19         A.        The office did, yes, and they were

20   forwarded to Craig Neveras.

21         Q.        Who received them and who forwarded

22   them to Mr. Neveras?

23         A.        Most likely, Jeremy Brown.

24         Q.        Okay.  Do you know approximately how

25   many inquiries were received by Mr. Brown and

56

1   forwarded to Mr. Neveras?

2        A.      I believe two or three.

3        Q.      Do you know approximately where in the

4   country those two or three were located?

5        A.      No.

6        Q.      To your knowledge, were any of them in

7   the State of Illinois?

8        A.      I don't know.

9        Q.      Did GPI have a Franchisee of the Year

10  award or something similar?

11       A.      Yes.

12       Q.      Okay.  To your knowledge, did Mr.

13  Rapsys ever win that award?

14       A.      Yes.

15       Q.      Do you know approximately how many

16  times he won that award?

17       A.      I may be wrong, but I believe it was

18  2009.

19       Q.      Just one time?

20       A.      No, I believe he had it two or three

21  years in a row.  That was prior to my knowledge of

22  the operation.

23       Q.      After you came aboard in or about 2012,

24  are you aware of Mr. Rapsys winning the Franchisee

25  of the Year award in any particular year?

57

1          MS. JANKOWSKI:  Objection to form.

2     A.     There was one conference I attended

3  and he did get an award.  I don't -- it might have

4  been 2014; I'm not sure.

5     Q.     Okay.  Since, let's call it 2014, has

6  GPI ever issued a Franchisee of the Year award to

7  any other franchisee?

8     A.     I have no knowledge.

9     Q.     Okay.  To your knowledge, prior to GPI

10 suing Mr. Rapsys, did Mr. Rapsys ever speak

11 negatively about GPI to any other franchisee?

12    A.     Did he what?  I'm sorry.

13    Q.     Speak negatively about GPI to any other

14 franchisee, prior to the lawsuit being filed.

15    A.     I have no way -- no, I can't answer

16 that.

17    Q.     Prior to the lawsuit being filed, what,

18 if anything, did Mr. Rapsys do to harm GPI's

19 business reputation, if at all?

20    A.     You know, there was one conference,

21 I'll give you an example, he was very bitter.  It

22 was sponsored by the Wyatts, and I walked into the

23 kitchen of Sally Wyatt and Vid was bad- mouthing my

24 husband and I was, like, in total shock and they

25 didn't see me and when he turned around, of course,

58

1    the conversation stopped.  Yes, he did.

2        Q.    Okay.  And what year, approximately,

3    was this, to your knowledge?

4        A.    I'm not sure what conference that was,

5    but it was sponsored by the Wyatts.  I would have to

6    look back and find out what year that was.

7        Q.    When was the last conference that was

8    held by GPI?

9        A.    2017, I believe.

10       Q.    So approximately six years ago?

11       A.    That might have been the conference.

12   That might have been the conference, I'm not sure.

13       Q.    So that conversation happened

14   approximately six years ago?

15       A.    That's probably fair to say, yes.

16       Q.    Okay.  And to your knowledge, did any

17   of the franchisees that heard those purported

18   comments depart the GPI system prior to July of

19   2022?

20       A.    No, I have no knowledge.

21       Q.    Have you ever read any of GPI's

22   franchise disclosure documents or FDDs?

23       A.    No.

24       Q.    Are you familiar when the last time GPI

25   issued an FDD?

59

```
 1          A.      No.
 2          Q.      Do you understand that as a matter of
 3    federal law, you need an FDD in order to sell
 4    franchisees in the United States?
 5                  MS. JANKOWSKI:  Objection to form.
 6                  MR. GOLDMAN:  That's fine.
 7                  MS. JANKOWSKI:  You can answer.
 8          A.      Yes.
 9          Q.      And without such FDD, it would be
10    legally impermissible to sell a franchise; do you
11    understand that?
12                  MS. JANKOWSKI:  Objection to form.
13          A.      I don't understand your question.
14          Q.      You understand that an FDD is required
15    in order to sell a franchise, correct?
16          A.      Yes.
17                  MS. JANKOWSKI:  Objection to form.
18          Q.      You said "yes?"
19                  MS. JANKOWSKI:  Just let me get the
20    objection out.  She answered "yes."
21                  MR. GOLDMAN:  Thank you.
22          Q.      And meaning if you don't have an FDD,
23    you can't sell a franchise, correct?
24                  MS. JANKOWSKI:  Objection to form.
25          A.      Yes.
```

60

1          Q.     And you don't recall the last time GPI

2    issued an FDD; is that correct?

3          A.     Correct.

4          Q.     Do you remember the last time an FDD

5    was sent to a perspective franchisee?

6          A.     No.

7          Q.     Do you remember the last time GPI

8    signed on a new franchisee?

9                 MS. JANKOWSKI:  Objection to form.

10   You can answer.

11         A.     No.

12         Q.     Over the last, let's call it -- strike

13   that.

14                In the last six years since that

15   purported conversation in the Wyatts' kitchen, has

16   GPI gained or lost franchisees in terms of the net

17   number of franchisees?

18         A.     I'm not sure because I'm not sure of

19   the time frame.

20         Q.     Okay.  Fair enough.

21                Prior to filing litigation in July of

22   2022, had any franchisee of the GPI system failed to

23   renew their franchise agreement upon expiration?

24         A.     I don't believe so, I'm not sure.

25   Beside Vid, I'm not sure.

61

1          Q.     Understood.  Besides Mr. Rapsys.

2                 Since July of 20 -- strike that.

3    Between -- actually, strike that.

4                 The franchise agreement that Mr. Rapsys

5    last signed expired in 2019, correct?

6          A.     I believe so, yes.  I'm not sure on

7    that, though.

8          Q.     It expired at some point in time,

9    correct?

10         A.     Yes.

11         Q.     After the expiration and through the

12   date the litigation was filed in July of 2022, did

13   you have any communications with Mr. Rapsys

14   directly?

15         A.     I believe I had one or two telephone

16   conversations, yes.

17         Q.     And when, approximately, would those

18   conversations have occurred?

19         A.     Right after my husband's passing.

20         Q.     Okay.  And what was the sum and

21   substance of those conversations?

22         A.     What his intentions were going

23   forward.

24         Q.     Am I to understand you're saying you

25   spoke to Mr. Rapsys to say, essentially, "What's

62

1    your plan here?"

2           A.     When he intended to pay his debt, yes.

3    That would have been the reason for the call.

4           Q.     And did you actually speak to Mr.

5    Rapsys or you tried to communicate with him and

6    didn't speak to him?

7           A.     I did, I had one or two -- like I

8    said, I had one or two conversations with him, yes.

9           Q.     And those were both by telephone?

10          A.     Yes.

11          Q.     I'm going to share my screen here, just

12   give me a moment.

13                 I've put on the screen a document that

14   was marked as Mr. Rapsys's deposition Rapsys 02.  Do

15   you see that on the screen?

16          A.     Yes.

17          Q.     Okay.  And at the top is an e-mail from

18   Jeremy Brown to Mr. Rapsys dated April 28, 2022.  Do

19   you see that?

20          A.     Yes.

21          Q.     And it says "Vid, I received your

22   e-mail responding to the GPI demand letter.  I will

23   be giving this to Diane tonight.  Thank you for

24   getting this to me.  If you need anything else,

25   please reach out to me."  Do you see that?

63

1          A.      Yes.

2          Q.      Okay.  And below that is an e-mail from

3    Mr. Rapsys that says "Hi, Jeremy.  A check for

4    $5688.78 is out today covering your invoice numbers

5    3392 and 3577."  Do you see that?

6          A.      Yes.

7          Q.      And then it says "Please relay the

8    following to Diane for me - Thank you."  Do you see

9    that?

10         A.      Yes.

11         Q.      Now, it appears to -- I'm going to

12   scroll and there's no reason to read it unless you'd

13   like to -- a four-and-a-half-page e-mail,

14   approximately, from Mr. Rapsys to yourself.  Do you

15   see that?

16         (Document is scrolled.)

17         Q.      Do you see the approximately four-and-

18   a-half-page e-mail from Mr. Rapsys to yourself?

19         A.      Okay, yes.  You went so fast, I didn't

20   know what I was looking at.

21         Q.      I'm sorry.  Do you see an e-mail here

22   that starts "Dear Diane"; do you see that?

23         A.      Yes.

24         Q.      And do you understand that "Diane"

25   referenced here is yourself?

64

1          A.      Yes.

2          Q.      And did you receive this e-mail as a

3    result of Mr. Brown sending it to you or providing

4    it to you?

5          A.      I don't recall that, no.  It's

6    possible.  It was difficult times.

7          Q.      Say that one more time?  I didn't hear

8    you.  I apologize.

9          A.      I said it's possible.  It was a very

10   difficult time for me, yes.

11         Q.      Understood.  To your knowledge, did you

12   ever respond to this e-mail, to the extent you did

13   receive it from Mr. Rapsys?

14         A.      No.  I don't know that I received it,

15   but no, I did not.

16         Q.      You did not respond?

17         A.      No.

18         Q.      In those conversations that you

19   mentioned, the one or two conversations, what did

20   Mr. Rapsys say when you inquired whether or not --

21   or what his plans were with respect to his Geese

22   Police franchise?

23         A.      I don't recall -- I don't recall the

24   conversation because it was some time ago, but the

25   bulk of the conversation would be "When are you

65

1   intending to send in the money you owe Geese

2   Police?"

3          Q.     Understood.

4          A.     Or GPI.

5               MR. GOLDMAN:  Let's take five minutes.

6   I may be done, I just want to go through my notes.

7               MS. JANKOWSKI:  Okay.

8        (Recess taken)

9               MR. GOLDMAN:  Ms. Marcks, I'd like to

10  thank you for your time today.  Subject to the one

11  question that your counsel instructed you not to

12  answer, I have no further questions for you at this

13  time, but I appreciate your time today.

14               THE WITNESS:  Thank you.

15               MR. GOLDMAN:  Thank you.

16               MS. JANKOWSKI:  Okay, this deposition

17  is concluded.  The witness will read and sign.

18  Thank you.

19               MR. GOLDMAN:  Have a great day.

20               MS. JANKOWSKI:  Thanks.  Bye.

21        (Deposition concluded at 11:43 a.m.)

22

23

24

25

66

# C E R T I F I C A T E

    I, MICHELE QUICK, a Certified Court Reporter, Registered Merit Reporter and Certified Realtime Reporter of the State of New Jersey, authorized to administer oaths pursuant to R.S. 41:2-1, do hereby certify that prior to commencement of the examination, DIANE MARCKS was duly sworn to testify to the truth, the whole truth and nothing but the truth.

    I DO FURTHER CERTIFY that the foregoing is a true and accurate verbatim transcript of the testimony as taken stenographically by me remotely, via Zoom, on the date hereinbefore set forth, to the best of my ability.

    I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_Michele Quick_

MICHELE QUICK, CCR, RMR, CRR
NJ Certified Court Reporter
License No. XIO1731

67

<u>E R R A T A    S H E E T</u>

GPI, LLC v. RAPSYS, INC., et al.
Civil Action No. 3:22-cv-04585
Deposition Transcript of Diane Marcks


<u>PAGE</u> <u>LINE</u> <u>CORRECTION</u>

              I DO HEREBY CERTIFY that I have read
       the transcript of my deposition and I swear
       it is true and correct to the best of my
       knowledge, subject to the above-referenced
       corrections.


       _____
       DIANE MARCKS

Sworn and subscribed before me this_____
day of_____, 2023.


_____
Notary Public of the State of _____