## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GPI, LLC,

               Plaintiff,

     v.

RAPSYS INCORPORATED d/b/a
GEESE POLICE OF NAPERVILLE;
and VIDMANTAS RAPSYS,

            Defendants.

Civil Action No. 3:22-cv-4585

---

## DECLARATION OF JACQUELINE M. WEYAND TO GPI LLC'S REPLY IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION

---

Jacqueline M. Weyand
Melissa J. Bayly
Buchanan Ingersoll & Rooney PC
550 Broad Street, Suite 810
Newark, NJ 07102-4582
973 273 9800 (o)
jacqueline.weyand@bipc.com
melissa.bayly@bipc.com

Gretchen L. Jankowski
(*admitted pro hac vice*)
Matthew C. Pilsner
(*admitted pro hac vice*)
Buchanan Ingersoll & Rooney PC
Union Trust Building
501 Grant Street, Suite, 200
Pittsburgh, PA 15219

*Attorneys for Plaintiff GPI, LLC*

I, Jacqueline M. Weyand, declare as follows:

1.      I am an attorney at the law firm of Buchanan Ingersoll & Rooney PC, counsel for Plaintiff, GPI, LLC ("GPI"). I have personal knowledge of the following and, if called upon to testify, could and would do so competently as to the accuracy of the matters stated herein. I submit this Declaration to Plaintiff's Reply in Support of Motion for Permanent Injunction.

2.      Attached hereto as **Exhibit 23** is a true and accurate copy of the email from Gretchen Jankowski, Esq. to the Hon. Tonianne J. Bongiovanni that was sent on September 27, 2023.

3.      Attached hereto as **Exhibit 24** is a true and accurate copy of excerpts from the deposition transcript of the Rule 30(b)(6) witness for Rapsys Incorporated d/b/a Geese Police of Naperville, Vidmantas Rapsys, that took place on April 20, 2023 n this litigation.

4.      Attached hereto as **Exhibit 25** is a true and accurate copy of the Order Regarding Claimant's Motion to Partially Dismiss Respondents' Counterclaims that was entered on August 17, 2023 in the JAMS Arbitration Proceeding captioned, *GPI, LLC v. Rapsys Incorporated and Vidmantas Rapsys*, at JAMS Ref. No. 542500103.

5.      Attached hereto as **Exhibit 26** is a true and accurate copy of excerpts from the deposition transcript of Vidmantas Rapsys that took place on October 12,

2023 in the JAMS Arbitration Proceeding captioned, *GPI, LLC v. Rapsys Incorporated and Vidmantas Rapsys*, at JAMS Ref. No. 542500103.

6.    Attached hereto as **Exhibit 27** s a true and accurate copy of a GPI, LLC document produced by Plaintiff at Bates GPI-0010507 – GPI-0010511, that was marked as Exhibit 2 during the deposition of Vidmantas Rapsys on March 28, 2023.

7.    Attached hereto as **Exhibit 28** is a true and accurate copy of an email from James Looney to Jeremy Brown dated October 30, 2023.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on November 13, 2023, in Newark, New Jersey.


Respectfully submitted,

/s/Jacqueline M. Weyand

Jacqueline M. Weyand

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the following counsel is being served with a copy of this document via the Court's CM/ECF system on this 13th day of November, 2023:

Evan M. Goldman
Greenspoon Marder LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 900
Newark, New Jersey 07102
(732) 456-8728
evan.goldman@gmlaw.com


/s/ *Jacqueline M. Weyand*
Jacqueline M. Weyand

# EXHIBIT 23

| | |
|---|---|
| **From:** | Gretchen Jankowski <gretchen.jankowski@bipc.com> |
| **Sent:** | Wednesday, September 27, 2023 5:13 PM |
| **To:** | NJDdb_ORDERS_Bongiovanni |
| **Cc:** | Evan.Goldman@gmlaw.com; Matthew Pilsner; Melissa J. Bayly |
| **Subject:** | GPI, LLC v. Rapsys Incorporated;  3:22-cv-04585-MAS-TJB |

Dear Judge Bongiovanni,

I write on behalf of GPI to request (1) leave of Court for GPI to file a partial motion for summary judgment on certain of Defendants' counterclaims; and (2) a trial date related to GPI's forthcoming motion for permanent injunction.  Opposing counsel is copied on this email.

As Your Honor no doubt recalls, a settlement conference occurred on August 22, 2023, and this case did not resolve.  No scheduling order therefore currently exists for the filing of dispositive motions or other pretrial deadlines, and the default timing for summary judgment motions in Rule 56(b) has since passed.  GPI therefore requires leave of Court to file a partial motion for summary judgment on certain of Defendants' counterclaims to move this case forward.  GPI is prepared to file its motion for summary judgment now and would request that any opposition be filed within the default time frame applicable under the Local Rules.

GPI also requests a trial date related to its motion for permanent injunction, which GPI intends to file this week.  GPI previously moved for a preliminary injunction to enforce a restrictive covenant against Defendants, its former franchisee, but no action has been taken on that motion, which has been ripe for more than one year.  GPI anticipates that any hearing on its motion for permanent injunction would last approximately two days.  GPI is willing to have this motion heard before Your Honor if that would assist the Court in scheduling this matter on an expedited basis before the end of this year.

GPI is making these requests via email considering Your Honor's direction at the conclusion of the August 22 settlement conference but can also file formal motions related to these requests if the Court prefers.

Respectfully submitted,

**Gretchen Jankowski**
**Co-Chair Litigation Section**
**Board Member & Shareholder**

***Pittsburgh Office***
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413

***San Diego Office***
One America Plaza
600 West Broadway, Suite 1100
San Diego, CA 92101-3387

412 562 1417 (o)
412 952 7734 (c)
gretchen.jankowski@bipc.com

# Buchanan

vCard | Bio | BIPC.com | Twitter | LinkedIn

# EXHIBIT 24

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OFF NEW JERSEY
 2
   GPI, LLC,                       )
 3                                 )
                     Plaintiff,    )
 4                                 )
   vs.                             )No. 3:22-cv-4585
 5                                 )
   RAPSYS INCORPORATED d/b/a       )
 6 GEESE POLICE OF NAPERVILLE      )
   and VIDMANTAS RAPSYS,           )
 7                                 )
                     Defendants.   )
 8
 9         The deposition of RAPSYS INCORPORATED d/b/a

10 GEESE POLICE OF NAPERVILLE, by and through its Designated

11 Representative, VIDMANTAS RAPSYS, called for examination,

12 taken pursuant to the provisions of the Code of Civil

13 Procedure and the Rules of the Supreme Court of the State

14 of Illinois, taken before JANET L. TSOKATOS, a Certified

15 Shorthand Reporter of said state, on the 20th day of April,

16 2023, at 9:00 o'clock a.m.

17

18

19

20

21

22

23

24
```

1    PRESENT:

2

3    BUCHANAN INGERSOLL & ROANEY PC
     MR. MATTHEW C. PILSNER
     Unio Trust Building
4    501 Grant Street
     Suite 200
5    Pittsburgh, PA 15219
     412.562.8800
6

7        on behalf of The Plaintiff,

8    GREENSPOON MARDER LLP
     MR. EVAN GOLDMAN
     One Riverfront Plaa
9    1037 Raymond Boulevard
     Suite 900
10   Newark, New Jersey 07102
     732.456.8728
11

12       on behalf of The Defendant.

13

14

     REPORTED BY:   JANET L. TSOKATOS, C.S.R.
15

16

17

18

19

20

21

22

23

24

```
 1                              (WHEREUPON, the witness was
 2                         duly sworn.)
 3                    VIDMANTAS RAPSYS
 4    called as a witness herein, having been first duly sworn,
 5    was examined and testified as follows:
 6                         EXAMINATION
 7    BY MR. PILSNER:
 8       Q.   Good morning, Mr. Rapsys.
 9       A.   Good morning.
10       Q.   We have met before, but for the record my name is
11    Matt Pilsner.  I'm from the law firm of Buchanan
12    Ingersoll & Rooney, and I represent the plaintiff GPI
13    LLC.  Are you represented today by counsel?
14       A.   Yes.
15       Q.   And who is that?
16       A.   Mr. Evan Goldman.
17       Q.   Okay.  You've been deposed before, correct?
18       A.   Yes.
19       Q.   And that was just on April 20th?
20       A.   Correct.
21       Q.   That was in your individual capacity, correct?
22            MR. GOLDMAN:  Sorry.  Apologies, Matt.  Today is
23    April 20th.
24            MR. PILSNER:  You are right.  I have the wrong
```

1      Q.   Okay.  Did you -- and I say you, I mean you on

2      behalf of Rapsys Inc., attempt to negotiate any term

3      with GPI in connection with the 1998 or 1999 handshake

4      agreement?

5      A.   Repeat that question again, please.

6      Q.   Sure.  At the time that you entered into this

7      handshake deal in 1998 or 1999, did you attempt to

8      negotiate any specific term with Mr. Marcks in relation

9      to that agreement?

10     A.   No.

11          MR. PILSNER:  Okay.  Melissa, can you put tab 4 up

12     as Exhibit 27, please.

13                         (WHEREUPON, Deposition Exhibit No.

14                         27 was marked for identification,

15                         as of 04/20/2023.)

16          MS. BAYLY:  Yep, uploading.  Okay.  It's up.

17          MR. PILSNER:  Thank you.

18     BY MR. PILSNER:

19     Q.   Mr. Rapsys, please let me know when you have that

20     up in front of you.

21     A.   Okay.  I have it.

22     Q.   For the record this is a document that starts

23     with the Bates number GPI-0012205.  Mr. Rapsys, this is

24     your 2003 agreement with GPI; is that right?

1     A.    Yes.

2     Q.    Did you ultimately sign this agreement?

3     A.    Yes.

4     Q.    And why did you sign this agreement?

5     A.    Because I wanted to operate the Geese Police.

6     Q.    But you previously had a handshake deal; is that

7  right?

8     A.    Yes.

9     Q.    So my question is why in 2003 did you enter into

10  a written agreement?

11    A.    Well, when we had the handshake deal we always

12  assumed that it would be a written agreement following.

13    Q.    So you signed this agreement in order to continue

14  acting as a Geese Police franchisee; is that right?

15    A.    Yes.

16    Q.    Okay.  Did Rapsys Inc. attempt to negotiate any

17  term with GPI before signing this agreement?

18    A.    No.

19          MR. PILSNER:  Melissa, can you put up tab 5,

20  please, and, for the record, this is a previously marked

21  exhibit Rapsys Number 1.

22          MS. BAYLY:  Okay.  It's up.

23          THE WITNESS:  Exhibit 1.

24

```
1    BY MR. PILSNER:
2       Q.   For the record this is a document bearing Bates
3    number GPI 0012271.  Mr. Rapsys, let me know when you
4    are ready.
5       A.   You know, that last agreement that was 2009.
6       Q.   Are you asking about Exhibit Number 1?
7       A.   Yes, the last one we were just talking about, I
8    think that was the one where I asked for a lower royalty.
9       Q.   Okay.  Other than asking for a lower royalty, did
10   you attempt to negotiate any other term in that
11   agreement?
12      A.   The date when the royalty payment was due.
13      Q.   And why did you attempt to negotiate the royalty
14   rate?
15      A.   Because I felt that after ten years, I think the
16   original rate was too much.
17      Q.   Okay.  And why did you attempt to negotiate the
18   date by which that royalty rate would kick in?
19      A.   When it was due?
20      Q.   Correct.
21      A.   Because -- because clients don't pay fast enough.
22      Q.   And just so I make sure I understand your
23   testimony.  Other than the date and the rate itself, did
24   you attempt to negotiate any other term in the 2009
```

1    franchise agreement?

2       A.   I'm going to say no, I don't recall anything else.

3       Q.   Can I direct your attention to Exhibit 28,

4    please.  For the record, this is a March 30th, 2014

5    amendment to franchise agreement; is that right?

6       A.   Yes.

7       Q.   Okay.  And you executed this agreement, correct?

8       A.   Yes.

9       Q.   Why did you renew your franchise agreement in

10   2014?

11      A.   Because I wanted to continue operating Geese

12   Police.

13      Q.   And when you say you wanted to Geese Police, does

14   that mean that you wanted to be a franchisee?

15      A.   Yes.

16      Q.   And why did you want to continue to be a

17   franchisee in 2014?

18      A.   Because I enjoyed what I was doing.

19      Q.   And in order to operate a Geese Police business

20   in Naperville, you would -- you were required to be a

21   franchisee; is that right?

22           MR. GOLDMAN:  Objection to form.  You can answer.

23           THE WITNESS:  Required by who?

24   BY MR. PILSNER:

1      A.    Yes.

2      Q.    Is this the email you sent in response to Dianne

3   Marcks March 30th, 2022 correspondence to you?

4      A.    Yes.

5      Q.    Okay.  And you mentioned that you previously sent

6   this to Dave; is that right?

7      A.    That is correct.

8      Q.    Okay.  And is that your reference to a fax to

9   Florida in maybe the second paragraph of your email?

10     A.    Yes.

11     Q.    Did you ever confirm that Dave in fact received

12  your fax?

13     A.    No.

14     Q.    Okay.  So you never reached out to Dave after

15  sending this fax saying did you get my message?

16     A.    I don't recall.

17     Q.    Okay.  But sitting here today you don't recall

18  ever doing so?

19     A.    I also don't recall ever not doing so.

20     Q.    Would you have any confirmation for record of

21  that fax to Florida?

22     A.    No, I do not.

23     Q.    And how were you so sure you don't have a record

24  of it?

1      A.    Because I had to go to my local FedEx Kinko's to

2   send it.

3      Q.    And you didn't get any document back showing that

4    it had gone through?

5      A.    I did, but I can't -- I don't know where it is.

6   Sure they gave me a receipt for paying for it.

7      Q.    Is that receipt something you would normally have

8    kept?

9      A.    Normally, but I fear that I put it in the console

10   of my vehicle, and from there it was lost.

11      Q.    Okay.  But it's fair to say that sitting here

12   today you don't have any specific recollection of having

13   a conversation with Dave about receiving or not

14   receiving this fax; is that fair?

15      A.    That's fair.

16      Q.    Okay.  Aside from sending this email to Dianne by

17   way of Jeremy, did you do anything else in response to

18   Ms. Marcks March 30, 2022 letter?

19      A.    No.

20      Q.    Let's look at Exhibit 4, please, and I'm going to

21   want to look at Exhibit F with Exhibit 4 and to help you

22   out, at the top of the page 8 going to say page ID 83.

23      A.    Okay.

24      Q.    Okay.  Did you receive this document?

1   relationship, and as I testified before, every time I

2   stated my side, what I think it should be, it always

3   ended in well, we'll figure it out.

4   BY MR. PILSNER:

5       Q.    Would you also describe the trademark licensing

6    agreement as aspirational?

7       A.    Since we never entered into one, yes.

8       Q.    But you continued to use the marks nevertheless;

9    is that right?

10      A.    That is right.

11      Q.    Let's look at the 7th affirmative defense on page

12   11.  Let me know when you are there.

13      A.    I am there.

14      Q.    It says, "Plaintiff's complaint is barred in

15   whole or in part.  Because in doing the things alleged

16   in complaint, the defendant acted in reliance of

17   misrepresentations by plaintiff"; do you see that?

18      A.    Yes.

19      Q.    What's the factual bases for this affirmative

20   defense?

21      A.    I am afraid I don't understand the legal language.

22   Could you rephrase it?

23      Q.    Sure.  So this 7th affirmative defense references

24   misrepresentations; is that right?

1   STATE OF ILLINOIS )

2                    )  SS:

3   COUNTY OF C O O K )

4           I, JANET L. TSOKATOS, a Notary Public within and

5   for the County of Cook, State of Illinois, and a

6   Certified Shorthand Reporter of said state, do hereby

7   certify:

8           That previous to the commencement of the

9   examination of the witness, The witness was duly sworn to

10  testify the whole truth concerning the matters herein;

11          That the foregoing deposition transcript was

12  reported stenographically by me, was thereafter reduced

13  to typewriting under my personal direction and

14  constitutes a true record of the testimony given and the

15  proceedings had;

16          That the said deposition was taken before me at

17  the time and place specified;

18          That the said deposition was adjourned as stated

19  herein;

20          That I am not a relative or employee or attorney

21  or counsel, nor a relative or employee of such attorney

22  or counsel for any of the parties hereto, nor interested

23  directly or indirectly in the outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my hand

1    and affix my seal of office at Chicago, Illinois, this

2    4th day of May, 2023.

3

4       Janet Tsokatos

5    _____

6    C.S.R. Certificate No. 84-3120.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 25

**JUDICIAL ARBITRATION AND MEDIATION SERVICE**
**NEW YORK, NEW YORK**

**IN THE MATTER OF THE ARBITRATION BETWEEN**

| | |
|---|---|
| **GPI, LLC,** | |
| Claimant | **JAMS Ref. No.: 5425001036** |
| vs. | |
| **RAPSYS INCORPORATED and VIDMANTAS RAPSYS,** | **Lisa D. Love, Arbitral Tribunal** |
| **Respondents** | |

**ORDER**
**(Regarding Claimant's Motion to Partially Dismiss Respondents' Counterclaims)**

I, the undersigned Arbitrator, having been duly appointed in accordance with the JAMS Streamlined Arbitration Rules and Procedures effective June 1, 2021 and having reviewed:

(1)     the Demand for Arbitration for Money Damages of GPI, LLC ("**GPI**" or the "**Claimant**") against Rapsys Incorporated and Vidmantas Rapsys (collectively, the "**Respondents**" and, together with the Claimant, the "**Parties**"), dated March 17, 2023 (the "**Demand for Arbitration**");

(2)     the Answer, Affirmative Defenses, and Counterclaims of the Respondents to Demand for Arbitration of the Claimant, dated June 27, 2023 (the "**Respondents' Answer**"), which contains, among other counterclaims, (a) counterclaims of Respondents requesting declaratory relief stating that: (i) GPI's claims are governed by Illinois law and that the choice of law in the expired Franchise Agreement (as hereinafter defined) as New Jersey law is void (the "**Choice of Law Counterclaim**"); (ii) alternatively, if the 2009 Franchise Agreement was renewed after its expiration in February 2019, the imposed statute of limitations is a one-sided and nonmutual provision, which is unenforceable or prohibited due to unconscionability (the "**Statute of Limitations Unconscionability Counterclaim**"); (iii) the purported notice of termination failed to provide adequate notice in violation of the Illinois Franchise Disclosure Act (the "**IFDA**") and the termination was unlawful (the "**Violation of Illinois Franchise Disclosure Act Counterclaim**"); and (b) a counterclaim, in the alternative, requesting damages and attorneys' fees for the alleged violation of the Illinois Franchise Disclosure Act by the Claimant (the "**Damages and Attorneys' Fees Counterclaim**," together with the Choice of Law Counterclaim, the Statute of Limitations Unconscionability Counterclaim, and the Violation of Illinois Franchise Disclosure Act Counterclaim,  the "**Counterclaims**");

(3)      the Claimant's Answer and Defenses to Respondents' Counterclaims, dated July 18, 2023;

(4)      the Claimant's Partial Motion to Dismiss Respondents' Counterclaims and Incorporated Memorandum of Law in Support of the Claimant, dated July 18, 2023 (the "**Partial Motion to Dismiss**"), specifically requesting the dismissal of the Counterclaims; and

(5)      the Respondents' Memorandum of Law in Opposition to Claimant's Partial Motion to Dismiss Respondents' Counterclaims, dated July 25, 2023 ("**Respondents' Opposition Memorandum**");

and having considered the matters raised in the above-referenced submissions, hereby finds as follows:

## BACKGROUND

In 1999, the Parties entered into a five-year franchise agreement (the "**1999 Franchise Agreement**") for the operation of a Canadian goose/bird control franchise (the "**Franchised Business**").  The Respondents allege that, at the time of execution of the 1999 Franchise Agreement and prior to the sale of its franchise to the Respondents, the Claimant did not register its franchise with the Illinois Attorney General's Office, as required by the IDFA.  In addition, the Respondents allege that: (a) the Claimant, in 1999, accepted money prior to issuing a Uniform Franchise Offering Circular ("**UFOC**") in violation of the IFDA; (b) the UFOC provided to the Respondents in 1999 did not include an Illinois addendum as required by the IFDA to advise the Respondents that Illinois law could not be contracted away; and (c) prior to signing the 1999 Franchise Agreement, the Claimant[1] did not register with the Illinois Attorney General, as required by the IFDA.  In 2004, the Parties extended the term of the 1999 Agreement for an additional five years to 2009 (the "**2004 Franchise Agreement Renewal**").

At the end of the 2004 Franchise Agreement Renewal, the Parties entered into a new franchise agreement in substitution for the 1999 Franchise Agreement (the "**2009 Substituted Franchise Agreement**").  The Respondents allege that the Claimant presented the Respondents with a pre-printed form of the 2009 Substituted Franchise Agreement which included a New Jersey choice of law provision but did not contain an Illinois addendum as required by the IFDA.  The Respondents allege that the Claimant had stronger bargaining power and that, having no real choice as to the material terms of the 2009 Substituted Franchise Agreement, they acceded to the terms of the 2009 Franchise Agreement since they would have lost their investment for the past 10 years.  The Respondents do not allege that they made any attempts to negotiate any terms of the 2009 Substituted Franchise Agreement asserting that it was presented on a "take it or leave it" basis.  On or about March 30, 2014, the Parties entered into a five-year extension of the 2009 Substituted Agreement extending the term to February 8, 2019 (the "**2014 Franchise Agreement Renewal**, together with the 2009 Substituted Franchise Agreement, collectively, the "**Franchise Agreement**").

---

[1] The Respondents' Opposition Memorandum at Page 2, Paragraph 1 states that the "Respondents" did not register with the Illinois Attorney General.  However, this Arbitrator has interpreted this to refer to the "Claimant."

The Claimant alleges that in 2019 at the end of the term of the Franchise Agreement, the Claimant submitted a new substitute franchise agreement to the Respondents, which the Respondents did not execute.  But, despite not executing the new substitute franchise agreement, the Claimant alleges that the Respondents continued to use the Claimant's proprietary marks and the system, continued to operate at its approved location and within its protected territory, maintained is registration with the State of Illinois to operate under the franchise tradename, continued to make certain payments to the Claimant, contracted with and sent invoices to customers using the franchise tradename, and continued to use an email account associated with the franchise until the Claimant terminated access to the email account in 2022,[2]  which the Claimant claims is a continuance of the operation of the Franchised Business and the Franchise Agreement.[3]  The Respondents allege that the Franchise Agreement naturally expired on February 8, 2019 at the end of the term, and deny that they continued to use the proprietary marks and the franchise system[4] or to operate the Franchise Business.

On May 23, 2022, the Claimant notified the Respondents of several defaults under the Franchise Agreement which had been ongoing from at least May 22, 2021 and provided the Respondents with an opportunity to cure such defaults within 30 days (the "**Notice of Default**").  When the Respondents failed to cure the defaults within the 30-day period, the Claimant terminated the Franchise Agreement by notice to the Respondents on June 24, 2022.[5]

Taking all of the continuous business activities of the Parties into account, the Parties had been conducting business for over twenty years and, as a result of such business activities, had entered into four agreements: the 1999 Franchise Agreement, the 2004 Franchise Agreement Renewal, the 2009 Substituted Franchise Agreement and the 2014 Franchise Agreement Renewal.

### CHOICE OF LAW COUNTERCLAIM
**(GPI's Claims Are Governed by Illinois Law and Choice of Law in The Expired Franchise Agreement As New Jersey Law Is Void)**

The Respondents claim that GPI's claims are governed by Illinois law and that Section 24.1 of the Franchise Agreement, which provides that "This Agreement shall be interpreted

---

[2] See Demand for Arbitration at Paragraph 24.

[3] It is not clear when the Respondents ceased to pay royalties after the natural expiration of the Franchise Agreement. In the Claimant's demand for arbitration at Paragraph 24, the Claimant alleges that the Respondents continued to "make certain payments to GPI, including for life insurance policies for Respondents' employees, through June 2022" and Exhibit F to the Claimant's Demand for Arbitration indicates that the Respondents have not paid any royalties since May 22, 2021.

[4] See Respondents' Answer at Paragraph 24.

[5] Paragraph 32 of the Demand for Arbitration refers to a termination notice dated June 24, 2022.  However, this Arbitrator has not located this notice of termination in the submissions of the Claimant.  This Arbitrator notes that the Notice of Default indicates that "This letter constitutes a written notice of termination under Section 14.3 of the Franchise Agreement, which allows you thirty (30) days from receipt of this letter to cure the defaults listed above.  If such cure is not timely, the Franchise Agreement will terminate immediately."

and construed in accordance with the laws of the State of New Jersey, notwithstanding any conflict of law rules," is contrary to Illinois law.

Generally, "Illinois [courts] respect a contract's choice—of—law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." "Illinois has a strong public policy, reflected in the Franchise Act, of protecting Illinois residents "who have suffered substantial losses to franchisors."  However, based upon the over 20-year continuous relationship of the Parties and the particular facts set forth in the submissions of the Parties, this Arbitrator concludes that the fundamental public policy protections of the IFDA are not compromised by determining that the Respondents are not entitled to receive the special protections afforded are IFDA for the violations alleged to have occurred by the Respondents.[6],[7],[8]

---

[6] In Bishop v. We Care Hair Dev. Corp., 316 Ill. App. 3d. 1182 (2000), cited in Respondents' Opposition Memorandum, the Court determined that "Not only do the franchise agreements in the instant case contain a choice of law clause, but many of the agreements incorporate it into the arbitration provision.  Therefore, we find that the choice of law clauses [in the franchise agreements and the arbitration provisions] reflect an agreement by the parties to arbitrate in Illinois." (Emphasis added).  Thereby enforcing the choice of law provision in the franchise agreement and the arbitration agreement between the parties.

[7] In Korean Am. Broad. Co., Inc. v. Korean Broad. Sys., 2012 WL 1080260 (2012), which involved a claim of damages caused by nonrenewal of a franchise agreement and was cited in the Respondents' Opposition Memorandum, the plaintiffs, franchisees, alleged violations of the IFDA, which provides a civil cause of action for damages caused by the termination of, or failure to renew, a franchise in violation of the statute.  815 ILCS 705/26.  The IFDA states in relevant part: "Nonrenewal of a franchise.  It shall be a violation of this Act for a franchisor to refuse to renew a franchise of a franchised business located in this State without compensating the franchisee either by repurchase or by other means for the diminution in the value of the franchised business caused by the expiration of the franchise." The court stated that "Illinois respects a contract's choice—of—law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy."  However, "Illinois has a strong public policy, reflected in the Franchise Act, of protecting Illinois residents "who have suffered substantial losses to franchisors."  This case is distinguishable from the present arbitration, which does not involve a claim of damages caused by termination or failure to renew by the franchisor.  Accordingly, the public policy issues in the Korean Am. case are inapplicable to the present arbitration.

[8] In Franklin's Sys., Inc. v. Infanti, 883, F. Supp. 246, (N.D. Ill. 1995), cited in the Respondents' Opposition Memorandum, the court determined the IFDA was sufficient to prevent the choice of law provision in a franchise agreement from serving as a basis for the exercise of personal jurisdiction but then applied Georgia's long-arm statute to determine that there were sufficient contacts with Georgia to apply Georgia law.

Specifically, the provisions of Section 5 of the IFDA (Prohibited Practices)[9] and Section 10 of the IFDA (Registration and Annual Reports)[10], which the Respondents allege that the Claimant has violated, are exempted from, and do not apply to, extensions or renewals of an existing franchise or a substitution of a modified franchise agreement where there is no interruption in the operation of the franchise business.[11]

In the present circumstances, given the over twenty-year continuous business relationship of the parties and the subsequent renewal, extensions and modifications of the franchise agreements, the provisions of the IFDA that the Respondents allege that the Claimant has violated are exempted from Sections 5 and 10 of the IFDA.  In addition, assuming the practices were not exempted, based upon Section 27 of the IFDA, the Respondents would not be able to institute civil action for any of the violations of the IFDA alleged by the Respondents to have occurred since the period of limitations have expired.[12]

Moreover, on June 13, 2023, the Parties and this Arbitrator held a preliminary scheduling hearing at which counsel for the Claimant and the Respondents were present to

---

[9] Section 5 of the IFDA (Prohibited Practices - 815 ILCS 705/5) provides that:

"1) Sale of unregistered franchise unlawful.  It is unlawful for any person to offer or sell any franchise required to be registered under this Act unless the franchise has been registered under this Act or is exempt under this Act.

(2) Failure to deliver a disclosure statement unlawful.  It is unlawful for any person to offer or sell any franchise which is required to be registered under this Act without first providing to the prospective franchisee at least 14 days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 14 days prior to the receipt by such person of any consideration, whichever occurs first, a copy of a disclosure statement meeting the requirements of this Act and registered by the Administrator, together with a copy of all proposed agreements relating to the sale of the franchise. For the purposes of this Act, delivery of a disclosure statement to a general partner of a partnership shall constitute delivery to the partnership and its partners and delivery of a disclosure statement to a principal officer of a corporation shall constitute delivery to the corporation and its shareholders.

(3) Sale of franchise by unregistered franchise broker unlawful.  It is unlawful for any franchise required to be registered under this Act to be offered for sale or sold in this State by a franchise broker subject to this Act who is not first registered under this Act unless exempt from registration.

(4) Filing of untrue report unlawful.  It is unlawful for any person to make or cause to be made any untrue statement of a material fact in any application, notice, or report filed with the Administrator, or to omit to state in any application, notice, or report any material fact, or to fail to notify the Administrator of any material change in such application, notice, or report, as required by this Act."

[10] Section 10 of the IFDA (Registration and Annual Report – 815 ILCS 705/10) provides that: "No franchisor may sell or offer to sell a franchise in this State if (1) the franchisee is domiciled in this State or (2) the offer of the franchise is made or accepted in this State and the franchise business is or will be located in this State, unless the franchisor has registered the franchise with the [Illinois Attorney General] by filing such form of notification and disclosure state as required under Section 16…"

[11] Section 7 of the IFDA (Sale by franchisee and extension or renewal of existing franchise - 815 ILCS 705/7) provides that: "There shall be exempted from the provisions of Sections 5, 10, 11, 13 and 15 this Act the extension or renewal of an existing franchise or the exchange or substitution of a modified or amended franchise agreement where there is no interruption in the operation of the franchise business by the franchisee."

[12] Sec. 27 of the IFDA (Periods of limitation - 815 ILCS 705/27) provides that: "No action shall be maintained under Section 26 of this Act to enforce any liability created by this Act unless brought before the expiration of 3 years after the act or transaction constituting the violation upon which it is based, the expiration of one year after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by this Act, or 90 days after delivery to the franchisee of a written notice disclosing the violation, whichever shall first expire."

develop a case management order that was fair, cost effective and designed to ensure that the Parties would conduct a focused and efficient arbitration hearing. As a result of the preliminary scheduling hearing and the agreement of the Parties, this Arbitrator issued Procedural Order No. 1, dated June 27, 2023 (the "**Procedural Order**"), which provides that "The Parties have agreed that the laws of the State of New Jersey shall apply to the substance of the dispute." (See Section 13 of the Procedural Order.)

Accordingly, the motion of the Claimant to dismiss the Choice of Law Counterclaim is hereby granted and the Choice of Law Counterclaim is hereby dismissed with prejudice.

## STATUTE OF LIMITATIONS UNCONSCIONABILITY COUNTERCLAIM
### (Imposed Statute of Limitations is a One-Sided and Nonmutual Provision, Which is Unenforceable or Prohibited Due to Unconscionability)

Section 24.6 of the Franchise Agreement provides that "any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Franchisor, or Franchisee's operation of the Franchised Business, brought by Franchisee against Franchisor, shall be commenced within one (1) year from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred." The Respondents claim that this provision is one-sided and nonmutual and, therefore, is unenforceable or prohibited due to unconscionability.

In Potomac Leasing,[13] the court held that "an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man could accept, on the other hand.[14] Such a contract is usually improvident, one-sided or oppressive.[15] However, unless there was a defect in the negotiation process at the time the contract was formed, courts generally will not interfere with the agreement entered into by the parties even though certain provisions favor one party over another.[16] This is especially true in the context of an arms-length agreement entered into between business concerns."[17]

Although the Respondents claim that the contract was presented to them on a "take it or leave it" basis, the Respondents do not allege that they made any attempts to negotiate the statute of limitations clause in the Franchise Agreement. In addition, although the statute of limitation provision favors the Claimant, the clause is not a provision that "no man in his senses, not under delusion, would not have made," and "which no fair and honest man could accept." Rather, nonmutual provisions in agreements limiting the period to bring actions against another party are typical and do not satisfy the unconscionability standard.

---

[13] Potomac Leasing Co. v. Chuck's Pub, Inc., 156 Ill.App.3d 755, 761, 509 N.E.2d 751 (1987),

[14] Citing Neal v. Lacob (1975), 31 Ill.App.3d 137, 142, 334 N.E.2d 435.

[15] Id. at 142.

[16] Citing Dana Point Condominium Association, Inc. v. Keystone Service Co. (1986), 141 Ill.App.3d 916, 920, 96 Ill.Dec. 249, 491 N.E.2d 63.

[17] Citing Dillman & Associates, Inc. v. Capitol Leasing Co. (1982), 110 Ill.App.3d 335, 341, 66 Ill.Dec. 39, 442 N.E.2d 311; Walter E. Heller & Co. v. Convalescent Home of First Church of Deliverance (1977), 49 Ill.App.3d 213, 219–20, 8 Ill.Dec. 823, 365 N.E.2d 1285.

Accordingly, the motion of the Claimant to dismiss the Statute of Limitations Unconscionability Counterclaim is hereby granted and the Statute of Limitations Unconscionability Counterclaim is hereby dismissed with prejudice.

### VIOLATION OF ILLINOIS FRANCHISE DISCLOSURE ACT COUNTERCLAIM
### (Notice of Termination Failed to Provide Adequate Notice in Violation of the Illinois Franchise Disclosure Act and the Termination Was Unlawful)

The Respondents allege that the Notice of Default was deficient under the IFDA because it failed to state an amount for past due royalties and stated the wrong termination date.[18] Having determined that the IFDA does not apply to the present arbitration, this Arbitrator, nonetheless, has conducted an analysis of the Notice of Default and Section 19 of the IFDA. Based upon such review, the Notice of Default exceeds the requirements of Section 19 of the IFDA, which neither requires that the Claimant state an amount for past due royalties nor requires that the Respondents be provided with notice and an opportunity to cure given the allegations of repeated violations of the Franchise Agreement.[19]

Moreover, it is doubtful that the Claimant had the information to state the amount of past due royalties in the Notice of Default, since one of the good causes for termination of the Franchise Agreement was the failure of the Respondents to furnish reports and financial statements that would have been required to calculate the amount of past due royalties.

Accordingly, the motion of the Claimant to dismiss the Violation of Illinois Franchise Disclosure Act Counterclaim is hereby granted and the Violation of Illinois Franchise Disclosure Act Counterclaim is hereby dismissed with prejudice.

---

[18] Section 19 of IFDA (Termination of a Franchise - (815 ILCS 705/19)) provides that:

 "(a) It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for "good cause" as provided in subsection (b) or (c) of this Section.

 (b) "Good cause" shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

 (c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:

  (1) makes an assignment for the benefit of creditors or a similar disposition of the assets of the franchise business;

  (2) voluntarily abandons the franchise business;

  (3) is convicted of a felony or other crime which substantially impairs the good will associated with the franchisor's trademark, service mark, trade name or commercial symbol; or

  (4) repeatedly fails to comply with the lawful provisions of the franchise or other agreement."

[19] See 815 ILCS 705/19(c)(4), supra.

**DAMAGES AND ATTORNEYS' FEES COUNTERCLAIM**
**(In the Alternative, Requesting Damages and Attorneys' Fees For**
**the Alleged Violation of the Illinois Franchise Disclosure Act by the Claimant)**

This Arbitrator, having made the findings set forth with respect to the Violation of Illinois Franchise Disclosure Act Counterclaim and having granted the motion of the Claimant to dismiss the same, the motion of the Claimant to dismiss the Damages and Attorneys' Fees Counterclaim based upon alleged violations of the IFDA is hereby granted and the Damages and Attorneys' Fees Counterclaim is dismissed with prejudice.

**So ordered by the Arbitral Tribunal**
   **this 17th day of August, 2023**

**Lisa D. Love**
**Arbitral Tribunal**

# EXHIBIT 26

1              JAMS

2    - - - - - - - - - - - x

3   GPI, LLC,                    :

4          Claimant,            :

5     v.                        :    JAMS Ref. No.:

6   RAPSYS INCORPORATED;        :    5425001036

7   AND VIDMANTAS RAPSYS,       :

8          Respondents.         :

9    - - - - - - - - - - - - x

10

11          Deposition of VIDMANTAS RAPSYS

12              Conducted Remotely

13           Thursday, October 12, 2023

14                  9:59 a.m.

15

16

17

18

19

20

21   Job No.: 509246

22   Pages: 1 - 165

23   Reported By: Anita M. Trombetta, RMR, CRR

24

25

1      Deposition of VIDMANTAS RAPSYS, conducted

2   remotely pursuant to notice, before

3   Anita M. Trombetta, RMR, CRR, Notary Public in and

4   for the State of New York.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              A P P E A R A N C E S

2    ON BEHALF OF THE CLAIMANT:

3        GRETCHEN JANKOWSKI, ESQUIRE

4        MATTHEW PILSNER, ESQUIRE

5        BUCHANAN INGERSOLL & ROONEY PC

6        Union Trust Building

7        501 Grant Street, Suite 200

8        Pittsburgh, PA 15219

9        412.562.8800

10

11   ON BEHALF OF THE RESPONDENTS:

12       KORY ANN FERRO, ESQUIRE

13       GREENSPOON MARDER LLP

14       1037 Raymond Blvd, Suite 900

15       Newark, NJ 07102

16       732.456.8746

17

18

19   ALSO PRESENT:

20        JEREMY BROWN

21        DIANE MARCKS .

22

23

24

25
```

1  V I D M A N T A S   R A P S Y S,

2         called as a witness, having been duly

3         sworn by a Notary Public, was examined and

4         testified as follows:

5  EXAMINATION BY

6  MS. JANKOWSKI:

7     Q   Good morning, Mr. Rapsys.

8     A   Good morning.

9     Q   You've been deposed twice before in the

10  federal court litigation, correct?

11    A   Yes.

12    Q   And it's fair to say you understand the

13  deposition process at this point, correct?

14    A   Correct.

15    Q   So the same ground rules that we had --

16  that you've had before are going to apply in this

17  proceeding.

18        Do you understand that?

19    A   I do.

20    Q   And from where are you testifying, sir?

21    A   My home office.

22    Q   And that's located in Naperville,

23  Illinois, correct?

24    A   Correct.

25    Q   And do you have access to your cell phone

1      Q  Do you recall any conversations with Diane

2   Marcks, after this fax was sent on 9/28/2021,

3   about the content of this fax?

4      A  No.  Because I -- I want to say that -- I

5   want to say that I think that since the date had

6   passed, I printed the draft of this fax and

7   emailed it to Jeremy to share with Diane because

8   it touched on a lot of stuff that we've been

9   discussing.  And, no, there was never any reply.

10      Q  All right.  And I know -- I know exactly

11   what email you're talking about because that's

12   been previously marked in your deposition.  So we

13   have that.

14         Prior to September 28, 2021, did you ever

15   provide this type of information to anyone at GPI

16   in a written document?

17      A  Nothing in a written document.  I only

18   spoke to Dave regarding these issues, but not as

19   often as you think we would have talked about it.

20   Once every six months, maybe.

21      Q  All right.  And when you're saying you

22   would have talked to Dave Marcks, again, I'm

23   talking about only about cell phone.

24         That would be reflected on your cell phone

25   records, correct?

```
 1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
 2      I, ANITA M. TROMBETTA, RMR, CRR the officer
 3  before whom the foregoing deposition was taken, do
 4  hereby certify that the foregoing transcript is a
 5  true and correct record of the testimony given;
 6  that said testimony was taken by me
 7  stenographically and thereafter reduced to
 8  typewriting under my direction; that reading and
 9  signing was requested [or not requested, as
10  appropriate]; and that I am neither counsel for,
11  related to, nor employed by any of the parties to
12  this case and have no interest, financial or
13  otherwise, in its outcome.
14         IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 23rd day of
16  October, 2023.
17  My commission expires: 10.07.2025
18  `
19
20
21  _____
22  Anita M. Trombette
23
24
25
```

# EXHIBIT 27

Message

| | |
|---|---|
| **From:** | Jeremy Brown [jeremy.brown@geesepolice.com] |
| **on behalf of** | Jeremy Brown <jeremy.brown@geesepolice.com> [jeremy.brown@geesepolice.com] |
| **Sent:** | 4/28/2022 6:11:50 PM |
| **To:** | Vid Rapsys [vid.rapsys@geesepolice.com] |
| **Subject:** | Re: Naperville, Il |

**3/28/23**

**Rapsys 02**

Vid

I received your email responding to the GPI demand letter.  I will be giving this to Diane tonight.  Thank you for getting this to me.  If you need anything, please reach out to me.

On Thu, Apr 28, 2022 at 12:59 PM Vid Rapsys <vid.rapsys@geesepolice.com> wrote:


Hi Jeremy -

A check for $5688.78 is out today covering your invoice #'s 3392 & 3577.

Please relay the following to Diane for me - Thank you.

Dear Diane -

I have to begin by saying I still can't really believe Dave is gone and I hope you are hanging in there. I hope you understand that no matter how our future relationship turns out I will always miss Dave and wish nothing but the best for you.

### RE: Franchise agreement

My agreement with Geese Police Inc expired a long time ago - several years in fact.  Prior to it expiring I never received any info, correspondence, renewal proposal - nothing. Even to this day.  When eventually asked about money I said I wanted to discuss it but never got any response to my request.  This went on for some time then last year (Nov/Dec I think) I spoke to Dave on the phone and explained what I felt and told him I would do my best to write it out clearly and email him.   This turned into a FAX to Florida I believe and I am including it in this message now:

*As difficult as it is to express my side of our business relationship I am going to do my best right now.*

*It is my belief that it has been a very long time since we really had a typical franchisor / franchisee relationship.*

*This is coming from my point of view only as a business owner/operator and not intended to be a slight on you or GPILLC.*

*Things one would absolutely expect from a franchisor would include:*

*Business assistance -*
*While most franchisee operations begin as almost a "turn key" business, like a McDonalds or an Orkin or Terminix pest control, I spent about a week in NJ and you about a week in IL and after that basically on my*

GPI-0010507

*own.  I was introduced to handling the dogs and use of a buoy (very important skills) and I did watch you interact with a handful of existing and potential clients.  I saw your set up and used this experience to get myself up and running.*

### Brand Recognition -
*While Geese Police is an awesome name, no property manager or really any company had heard of it.  I would say 99% my clients never knew there were other Geese Police offices so as I mentioned - very cool name but really no "brand recognition" to speak of.*

### Lower failure rate - *Lower risk -*
*In general yes, your always available if I have a question, but it has been up to me (as it should be) not to fail.  It is certainly a "risky" undertaking to start any business and the 2 week intro certainly helped, but in the long run is it worth the endless royalty?*

### Buying Power -
*This has been an area where there has been really no advantage.  Things like GL Ins, Auto Ins, Cell phone service, Vehicle purchasing & repair and even dogs.  Seems like dogs on the east coast are just more expensive than dogs in the midwest or south.  Side note - I have never purchased a dog from anyone other than you, but I do search on the internet to see what is out there.*

### Built in customer base -
*The biggest obstacle for a business like ours is finding new customers.  While most franchises come with instant brand recognition, Orkin - Terminix, we really did not.  As I mentioned, 99% of the people I deal with have no idea there are other Geese Police offices and none have given me any business just because I was Geese Police and they dealt with us in another city.*

### Marketing -
*We do have a website.  I always asked new potential clients how they heard of me.  Probably 25% say google, which I assume is the website.  They rest say someone local referred me.*

### Ongoing training -
*I know this would be available if I asked for it, but many franchors would interact and keep up to date any new ideas when it comes to the best tools or techniques - off the top of my head the buoy is a great tool and so is a green laser when the sun is low or at night.  If you can't use a dog because of conditions or it's too dark do you use an RC boat or drone?  When there is ice I have an rc "gator" boat  that works pretty good since the prop is on top of the boat and it's not expensive of a pain to maintain like the one's you used at that Philadelphia race track when I was out there in 98. I know this is a lot of common sense stuff but is there more out there?  What are the most successful sales techniques or are we just trying to be the lowest bidder nowadays?*

*Now don't get me wrong, I have cherished doing what I do.  This kind of work suits me and I will be the first to admit that I wish I would have run the office portion of the business like I did operations but here I am.*

*Over the years I have paid you over $350,000 for basically a couple of weeks of training and a very cool name.  This is why I think we should come up a **Trademark licensing agreement.**  This can be a fixed fee. I want to continue operating as Geese Police.  I want to come up with an arrangement that is fair to both of us.  I want to work everything out and remain friends. One way or another I will not let this relationship end on a sour note. If I have to pay you some agreed upon amount of money and then walk away so be it.  We will likely be moving in 5 years and although it would be a terrible shame to let things dry up when I go.  I hope to figure something out.  Do you want to buy my sales?  If one of your people want a change they could move here and run an already existing business and the revenues could go straight to you. I would set them up with*

*the system I would run if I could do it all over knowing what I know now.  Just a thought, like I mentioned 5 years will go quickly I imagine. As a last resort, if/when I do sell I could settle any outstanding issues then.*

*Other issues ;*

*JLL checks:*

*Dianne sent me a copy of 4 checks that had posted from JLL that were sent to me:*
*#602229     $1400.00*
*#602268     $1400.00*
*#602343     $1400.00*
*#602468     $1750.00*

*This only totals $5950 - less than the 20k you said I stole.  If there are more please show me and I will take care of it asap.  BTW these checks were addressed to me and came from a company and address I serviced.  I admit that my system of piling up my deposits and entering them into the computer several months late contributed to this mess but I would never intentionally steal from you and had my bank account been full of money I would happily write you a check to cover what I owe and avoid this awkwardness. I still remember at one of the last meetings so long ago after people were ganging up on you about sales and responsibilities I stood up and said it is on each of us individually to make ourselves successful and not you to come out and sell for us.  Then you told the entire room that you were being robbed. No names were mentioned but I would have thought we would talk on the side about it.*


*How about something positive -*

*Final installment for Rex ($4000) in mail today.  Cash flow over the summer is slower, as you are probably aware.  As more money from the fall comes in I will get the rest in order. About 20% of my customers even pay in 30 days  45/60 is easily the norm.*




*--*
*Vid Rapsys*


## RE: Jones Lang LaSalle $
Every time I told Dave about the cancelled checks Dianne gave me (i still have her email), he said someone would get back to me and I have not received any feedback.  The info is in the above FAX copy.

## RE: Moving Forward

So with the above being my basic feelings about continuing the way we did before I have to ask where do we go from here?

I have 5 years before my wife will retire from teaching with a full pension.  I will only be 58 and not quite ready to retire, but I'm pretty sure we will be moving away from IL.  Logically we will move where our children are.

Can we begin anew with Trademark Licensing  agreement? I would work for 5 more years and then try to sell the business I have.  The value will be my existing clients receivables and the name Geese Police. If i can sell

GPI-0010509

the business I would push for the importance of the "name" and hopefully they could continue with you. My clients have been loyal and there would be instant sales revenue for whoever buys it. Maybe someone in NJ wants a location change? I would make the transition as easy as possible.

I actually have another idea I would like to run past you.

You might think this is crazy and want nothing to do with me any more but this business has been my life for almost 25 years and I would like nothing more than to help Geese Police be the best that it can be. So,,,,

Would you be interested in me helping with GPILLC's franchisor / franchisee relationship(s)?  I would like to visit all the franchises and see how they get things done. Everyone probably does things a little differently.  I would like to see what works well and what doesn't.  Compile a report and share it with you and then share with franchisees.  I know there are little things I do that make my life so much easier and if we can learn from each other we can all do better.  I have been doing this for so long that there is nothing I personally haven't experienced.  I think I could be helpful in building a positive relationship with franchisees.  This could evolve into a constant flow of information and communication I think everyone would appreciate. There has been no real "relationship" with me for 10 years or so now.  I can only assume it's been the same for the others.  This is just a portion of how I think I could be a valuable asset to you. I think there are plenty of little things we can do to bolster GPI's presence for the franchisees. My proposal is to do this for you for the ability to continue using the name Geese Police.  Any expenses I accrue, and of course my time would be covered by me until at least until the day I sell and move.  After that I would still like to work together and would be happy to talk about how I think that could work.

If none of the above is of interest to you I will have to ask what I need to do to dissolve our relationship once and for all.  I would hope expectations could be kept real and it could be as amicable as possible.  No matter what I am glad I called Dave back in 1998 and him telling me if I was crazy enough to drive out in Feb and shadow him for a couple of days we could talk.

This email is long and probably hard to follow.  If we can do any of the above I would be happy to go to NJ in person to hash it out.  I have never met Jeremy and did not realize you were "hands on" with the running of GPI.  Like I said  - my first inclination would be for myself to be a part of GPI moving forward.  I hope we can get together and talk.

With gratitude,


--
Vid Rapsys

**GEESE POLICE**
**Tel - 630-548-9781**
**Fax - 630-548-9258**

vid.rapsys@geesepolice.com

www.geesepoliceinc.com



--
Jeremy Brown
General Manager Geese Police Inc - Headquarters

Manager of Franchise Operations GPI, LLC
5050 West Hurley's Pond Rd
Wall NJ 07719
Office: 732-938-9093
Mobile: 732-580-7932
www.geesepolice.com

EXHIBIT 28

**lisa.groat@geesepolice.com**

| | |
|---|---|
| **From:** | James Looney <jal121160613@gmail.com> |
| **Sent:** | Monday, October 30, 2023 12:33 PM |
| **To:** | Jeremy Brown |
| **Subject:** | Re: |

Jeremy

Still having alot of problems with the service out here and would appreciate a response.

Can you give me a call or email and let me Kel what's going on with our service out here in Elburn ?

James
216 703 0036

On Thu, Dec 15, 2022 at 11:19 AM James Looney <jal121160613@gmail.com> wrote:
Hi Jeremy -

Following up here, is the Village of Elburn still under contract with GP? If so can you please put me in contract with our account manager?

James Looney

On Tue, Dec 13, 2022 at 8:45 AM James Looney <jal121160613@gmail.com> wrote:
Hi Jeremy

We're still having an issue at Elburn Station with geese. Dozens of geese have been here for multiple days in a row. Picture attached. This is the 5th time I have had to reach out to GP and report ongoing issues. Can you confirm GP is coming on a daily basis ?

James

On Thu, Nov 17, 2022 at 11:58 AM James Looney <jal121160613@gmail.com> wrote:
the geese are here now i get they are migrating so they come at different times, but have been here consistently throughout the week - if you tell me you can confirm your people have bene coming everyday, that will be good enough for me. Just tired of their mess.

Thanks!

On Thu, Nov 17, 2022 at 11:23 AM Jeremy Brown <jeremy.brown@geesepolice.com> wrote:
I will look into this and get back to you. Sometimes the trucks come in before six. What time are you seeing the geese?

On Thu, Nov 17, 2022, 11:40 AM James Looney <jal121160613@gmail.com> wrote:
Hi Jeremy -

Following up on this Geese are back today and have been here all week. I have not seen any GP trucks. Can you confirm whats going on?

James
216 703 0036

On Tue, Nov 15, 2022 at 9:06 AM James Looney <jal121160613@gmail.com> wrote:
 if the matter cannot be resolved internally please give me the illinois franchise contract information thanks

On Mon, Nov 14, 2022 at 7:25 PM Jeremy Brown <jeremy.brown@geesepolice.com> wrote:
 Thank you for reaching out. Have you spoke to our Illinois franchise. Please let me know.

 Jeremy